# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------x
                                        :
In re:                                  :   Chapter 11
                                        :
        KATY INDUSTRIES, INC., et al.,¹  :   Case No. 17-11101 (___)
                                        :
                Debtors.                :   (Joint Administration Requested)
------------------------------------------------------------x
```

**MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO OBTAIN SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION FINANCING, (II) AUTHORIZING POSTPETITION USE OF CASH COLLATERAL, (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

The above-captioned debtors (the "Debtors"), by and through their proposed counsel, DLA Piper LLP (US), hereby submit this motion (the "Motion"), (I) for entry of orders substantially in the form attached to this Motion as **Exhibit A** (the "Interim DIP Order") and a final order to be filed with the Court (a "Final DIP Order," and together with the Interim DIP Order, the "DIP Orders"), among other things, (a) authorizing Debtors Katy Industries, Inc., Continental Commercial Products, LLC, FTW Holdings, Inc., and Fort Wayne Plastics, Inc. (the "Debtor Loan Parties") and certain non-Debtor foreign affiliates (the "Non-Debtor Loan Parties") and together with the Debtor Loan Parties, the "Loan Parties") to obtain superpriority secured postpetition financing (generally, the "DIP Financing") pursuant to the *Debtor-in-Possession Credit and Security Agreement*, with Jansan Acquisition, LLC as the lender (the "DIP

---

¹     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Katy Industries, Inc. (7589), Continental Commercial Products, LLC (3898), FTW Holdings, Inc. (7467), Fort Wayne Plastics, Inc. (7470), Wabash Holding Corp. (9908), Katy Teweh, Inc. (9839), WII, Inc. (0456), TTI Holdings, Inc. (8680), GCW, Inc. (5610), Hermann Lowenstein, Inc. (4331), American Gage & Machine Company (7074), WP Liquidating Corp. (2310), Ashford Holding Corp. (8113), and HPMI, Inc. (4677). The corporate headquarters and the mailing address for the Debtors listed above is 11840 Westline Industrial Drive, Suite 200, St. Louis, MO 63146.

Lender"), substantially in the form attached hereto as **Exhibit B** (as amended, supplemented, or otherwise modified from time to time, the "DIP Credit Agreement," and collectively with the schedules and exhibits to be completed and attached thereto, all agreements, documents, certificates, instruments and/or amendments executed by and/or delivered by or to any Loan Party in connection therewith and the DIP Orders, the "DIP Loan Documents"), (b) granting to the DIP Lender the DIP Liens (defined below) on the DIP Collateral (defined below) and a superpriority administrative expense claim to the extent provided in the DIP Orders and the DIP Loan Documents, (c) granting adequate protection to the Prepetition Second Lien Secured Parties (defined below), and (d) authorizing postpetition use of cash collateral in which the Prepetition Second Lien Secured Parties assert an interest (the "VPC Cash Collateral"); (II) for entry of an interim order substantially in the form attached to this Motion as **Exhibit C** (the "Interim Cash Collateral Order") and a final order to be filed with the Court (a "Final Cash Collateral Order" and together with the Interim Cash Collateral Order, the "Cash Collateral Orders"), among other things, (a) authorizing postpetition use of Cash Collateral in which the Prepetition First Lien Secured Parties (defined below) assert an interest (the "Encina Cash Collateral") and (b) granting adequate protection to the Prepetition First Lien Secured Parties; (III) scheduling a final hearing on the Motion; and (IV) granting related relief.  In support of the Motion, the Debtors rely upon and incorporate by reference the *Declaration of Lawrence Perkins in Support of First Day Pleadings* (the "First Day Declaration") and the *Declaration of Alex Stevenson in support of DIP Financing Motion* (the "Stevenson DIP Declaration"), both filed with the Court concurrently with the Motion.  In further support of the Motion, the Debtors respectfully represent as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over these cases and this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware dated as of February 29, 2012.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.

3.      Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors consent to the entry of a final judgment or order with respect to the Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

4.      The statutory bases for the relief requested are sections 105(a), 361, 362, 363, 364, 365, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1(b) and 4001-2.

## INTRODUCTION

5.      As explained in detail below, among others, the Loan Parties are obligated under (i) the Prepetition First Lien Credit Agreement (as defined below), which is an asset-based revolving and term facility that conditions each extension of credit upon a certification of a certain level of the borrowing base and (ii) the Prepetition Second Lien Credit Agreement (as defined below), which is a term loan.  The DIP Credit Agreement is a secured  superpriority debtor in possession multiple-draw term loan in the aggregate principal amount of $7,500,000, with up to $4,500,000 to be funded on an interim basis.  The DIP Liens (as defined below) will be junior to the Prepetition First Liens and senior to the Prepetition Second Liens.

6.      The Debtors will not be obtaining credit under the Prepetition First Lien Credit Agreement, and instead are borrowing under the DIP Credit Agreement.  The mechanism under the Prepetition First Lien Credit Agreement will be preserved postpetition and periodically act as a measurement for additional adequate protection to be provided to the Prepetition First Lien Secured Parties in consideration of the Prepetition First Lien Secured Parties' consent to Debtors' use of the Prepetition First Lien Secured Parties' Cash Collateral.

7.      The DIP Facility proceeds will be used for (i) general working capital and operational expenses, (ii) administration of these chapter 11 cases, (iii) funding the Professional Fee Account (as defined below); (iv) funding cash collateral for the benefit of the Prepetition First Lien Agent to increase Availability (as defined below) from a negative amount to zero in accordance with the Interim Cash Collateral Order; and (v) costs, expenses, and all other payment amounts contemplated in the DIP Credit Agreement, in any such case, in accordance with the DIP Budget (as defined in the DIP Credit Agreement), subject to any Permitted Variance (as defined in the DIP Credit Agreement) Prepetition First Lien Agent.

## **BACKGROUND**

**A.      The Debtors and These Chapter 11 Cases**

8.      On May 14, 2017 (the "<u>Petition Date</u>"), each of the Debtors filed with this Court a voluntary petition for relief under the Bankruptcy Code.

9.      The Debtors continue to be in possession of their properties and to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date hereof, no trustee, examiner, or official committee of unsecured creditors has been appointed in the Debtors' chapter 11 cases.  No date has been set for a creditor meeting pursuant to section 341 of the Bankruptcy Code.

10.     The Debtors in these chapter 11 cases are Katy Industries, Inc., a publicly traded Delaware corporation, and certain of its wholly-owned direct and indirect subsidiaries (collectively, the "Company").  Founded more than 50 years ago, the Company is a well-known manufacturer, importer, and distributor of commercial cleaning and consumer storage products as well as a contract manufacturer of structural foam products.  The Company distributes its products across the United States and Canada.  The Company is best known for such brands as Continental®, Huskee®, Color Guard®, Wilen®, Muscle Mop®, Contico®, Tuffbin®, and SilverWolf®, among many others.  The Company operates three manufacturing facilities located in Jefferson City, Missouri, Tiffin, Ohio, and Fort Wayne, Indiana, with its corporate headquarters located in St. Louis, Missouri.  The Company currently employs approximately 300 employees, and supplements its workforce with a significant number of additional labor employed through third parties.  The Company boasts a broad and loyal customer base with over 1,500 customers encompassing stable industry leaders, providing the Company with a sustainable platform of consumable products and a recurring revenue source.  In the fiscal year 2016, the Company generated revenues of approximately $107.9 million across its various business units.

11.     Over the years, the Company acted as an acquirer of various business units, a number of which came with substantial legacy liabilities which caused increasing strains on the Company's liquidity.  More recently, in mid-2015, the Company encountered operational challenges primarily as a result of the move of its Bridgeton manufacturing facility (now known as the Jefferson City facility), which led to a marked decline in the Company's cash flow.  The relocation, which involved moving all manufacturing operations, caused prolonged production delays, triggered a substantial increase in outsourcing and maintenance costs, thereby reducing

revenue and costing the Company millions of dollars in increased costs. Exacerbating these issues, the synergies expected to be realized from the acquisition of the Tiffin manufacturing facility in late 2015 took longer than expected to realize, resulting in further pressures to the Company's already fragile financial state. Both the losses associated with the Bridgeton facility relocation, and the substantial unrealized investments relating to the Tiffin facility acquisition, when combined with the Company's significant legacy liabilities, led to severely constricted liquidity available to the Company under its existing credit arrangements. Despite numerous efforts to seek alternative financing or investments during this time, the Company was unable to overcome these obstacles, leading to the filing of these chapter 11 cases.

12.     The Debtors have determined that preserving and maximizing the value of the Company for the benefit of its customers, employees, vendors, and other stakeholders is best accomplished through the sale of substantially all of their assets. To this end, the Debtors entered into an asset purchase agreement with Jansan Acquisition, LLC ("Jansan" or the "Stalking Horse Purchaser"), a newly created entity co-owned by Highview Capital, LLC, a third-party investor and affiliate of Victory Park Management, LLC, as administrative agent for the Company's pre-petition second lien lender. In addition, the Debtors procured a $7.5 million debtor-in-possession financing (the "DIP Facility") from Jansan (the "DIP Lender") to provide the Debtors with sufficient liquidity to operate their businesses in chapter 11 during the pendency of the sale process. With these commitments in place, and given the Company's strong portfolio of proprietary brands, and that end-user demand for the Company's products is stable and recurring, a sale process effectuated under section 363 of the Bankruptcy Code has the potential to preserve the jobs of hundreds of employees and the value of products and brands developed by

the Company over the last fifty years, ultimately inuring to the benefit of all of the Debtors' stakeholders.

**B.     The Debtors' Prepetition Capital Structure**

13.    As of the Petition Date, the principal amount of the Debtors' funded debt obligations totaled approximately $58.75 million, which amount comprises the obligations under the Prepetition First Lien Credit Agreement of approximately $20.5 million and the obligations under the Prepetition Second Lien Credit Agreement of approximately $38.25 million.  The Debtors are also obligated for unsecured trade debt and legacy liabilities, as more fully described in the First Day Declaration.

*a.     Prepetition First Lien Credit Agreement*

14.    Prior to the Petition Date, Encina Business Credit SPV, LLC, in its capacity as first lien agent (together with its successors and assigns, the "Prepetition First Lien Agent"), and certain parties that are lenders under the First Lien Credit Agreement (the "Prepetition First Lien Lenders," and together with the Prepetition First Lien Agent, the "Prepetition First Lien Secured Parties") made loans and advances, and/or provided other financial accommodations, to or for the benefit of the Loan Parties in an aggregate principal amount of approximately $[19.6] million as of the Petition Date pursuant to (x) that certain credit and security agreement, dated as of November 16, 2016 (as amended, restated, supplemented or modified from time to time, the "Prepetition First Lien Credit Agreement"), by and among the Loan Parties and the Prepetition First Lien Secured Parties, and (y) all other agreements, documents and instruments executed and/or delivered to or in favor of the Prepetition First Lien Agent in connection with the Prepetition First Lien Credit Facility, including, without limitation, all security agreements, the Prepetition Intercreditor Agreement (as defined below), notes, guarantees, mortgages, Uniform

Commercial Code financing statements and all other related agreements, documents and instruments, including any fee letters, executed and/or delivered in connection therewith or related thereto (all the foregoing, together with the Prepetition First Lien Credit Agreement, as all of the same have been supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the Petition Date, collectively, the "Prepetition First Lien Documents"). The "Obligations" (as defined in the Prepetition First Lien Credit Agreement) as of the Petition Date, including principal, interest, fees, costs and other charges incurred before and after the Petition Date (pursuant to the Prepetition First Lien Credit Agreement) are referred to as the "Prepetition First Lien Obligations".

15. Pursuant to the Prepetition First Lien Documents, the Prepetition First Lien Obligations are secured by a security interest in and lien on (the "Prepetition First Liens") on the "Collateral" (as defined in the Prepetition First Lien Credit Agreement, and as used herein, the "Prepetition First Lien Collateral"). The Prepetition First Lien Documents evidence and govern the Prepetition First Lien Obligations, the Prepetition First Liens and the prepetition financing relationship among Debtors, Prepetition First Lien Agent, and Prepetition First Lien Lenders, and are valid and enforceable by Prepetition First Lien Agent against Debtors.

16. As of the Petition Date, each Loan Party is liable for payment of the Prepetition First Lien Obligations, and the Prepetition First Lien Obligations are an allowed secured claim, in a principal amount of approximately $[19.6] million, exclusive of accrued and accruing Allowable 506(b) Amounts (as defined in the Interim Cash Collateral Order).

17. The Prepetition First Lien Obligations constitute the legal, valid and binding obligation of each Loan Party, enforceable in accordance with the terms of the Prepetition First Lien Documents. No offsets, defenses or counterclaims to the Prepetition First Lien Obligations

exist, and no portion of the Prepetition First Lien Obligations is subject to avoidance or subordination (other than with respect to the Carve-Out (as defined below)) pursuant to the Bankruptcy Code or applicable nonbankruptcy law. The Prepetition First Liens, among other things, secure payment of all of the Prepetition First Lien Obligations. The Prepetition First Liens are first priority liens, subject only to Permitted Priority Liens (as defined in the Interim DIP Order). The Debtors believe that the value of the Prepetition First Lien Collateral as of the Petition Date exceeds the Prepetition First Lien Obligations.

<strong><em>b.    Prepetition Second Lien Credit Agreement</em></strong>

18.    Prior to the Petition Date, Victory Park Management, LLC, in its capacity as second lien agent (in such capacity, together with its successors and assigns, the "Prepetition Second Lien Agent"), and certain parties that are lenders under the Prepetition Second Lien Credit Agreement (as defined below) (the "Prepetition Second Lien Lenders," and together with the Prepetition Second Lien Agent, the "Prepetition Second Lien Secured Parties") made loans and advances, and/or provided other financial accommodations, to and for the benefit of the Loan Parties in an initial principal amount of $31 million in the aggregate pursuant to (x) that certain second lien credit and security Agreement, dated as of April 7, 2015 (as amended, restated, supplemented or modified from time to time, the "Prepetition Second Lien Credit Agreement"), by and among the Loan Parties and the Prepetition Second Lien Secured Parties, and (y) all other agreements, documents and instruments executed and/or delivered to or in favor of the Prepetition Second Lien Agent in connection with the Prepetition Second Lien Credit Facility, including, without limitation, all security agreements, the Prepetition Intercreditor Agreement, notes, guarantees, mortgages, Uniform Commercial Code financing statements and all other related agreements, documents and instruments, including any fee letters, executed

and/or delivered in connection therewith or related thereto (all the foregoing, together with the Prepetition Second Lien Credit Agreement, as all of the same have been supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the Petition Date, collectively, the "Prepetition Second Lien Documents" and together with the Prepetition First Lien Documents, the "Prepetition Loan Documents").    The "Obligations" (as defined in the Prepetition Second Lien Credit Agreement) as of the Petition Date, including principal, interest, fees, costs and other charges incurred before and after the Petition Date (pursuant to the Prepetition Second Lien Credit Agreement) are referred to as the "Prepetition Second Lien Obligations."    The Prepetition First Lien Obligations and the Prepetition Second Lien Obligations are referred to collectively as the "Prepetition Obligations."

19.    Pursuant to the Prepetition Second Lien Documents, the Prepetition Second Lien Obligations are secured by a security interest and lien (the "Prepetition Second Liens") on the "Collateral" (as defined in the Prepetition Second Lien Credit Agreement, and as used herein, the "Prepetition Second Lien Collateral," and together with the Prepetition First Lien Collateral, collectively, the "Prepetition Collateral").    The Prepetition First Liens and the Prepetition Second Liens are referred to collectively as the "Prepetition Liens."

20.    The Prepetition Second Liens are (A) legal, valid, binding and enforceable against the Loan Parties, each in accordance with its terms, (B) not subject to any recoupment, rejection, avoidance, reductions, recharacterization, set-off, subordination (whether equitable, contractual or otherwise, except pursuant to the Prepetition Intercreditor Agreement), counterclaims, cross-claims, disallowance, impairment, defenses or any other claims, causes of action or challenges of any nature under the Bankruptcy Code, any other applicable law or regulation or otherwise by any person or entity, and (C) shall constitute "allowed claims" within the meaning of section 502

of the Bankruptcy Code.  As of the Petition Date, the Debtors were truly and justly indebted and liable in respect of the Prepetition Second Lien Obligations, in an aggregate amount of not less than $38,244,336.

21.     The Prepetition Second Liens (A) constitute valid, binding, enforceable, nonavoidable, and properly perfected liens on the Prepetition Second Lien Collateral that secure all the Prepetition Second Lien Obligations, subject to the terms of the Prepetition Intercreditor Agreement, ranked junior in priority to the Prepetition First Liens; (B) are not subject to any other attachment, recoupment, rejection, avoidance, reductions, recharacterization, set-off, subordination (whether equitable, contractual or otherwise, except pursuant to the Prepetition Intercreditor Agreement), counterclaims, cross-claims, defenses or any other claims, causes of action or challenges of any nature under the Bankruptcy Code, any other applicable law or regulation or otherwise by any person or entity; and (C) were not otherwise subject to any liens, security interests, or other encumbrances other than liens permitted under the Prepetition Loan Documents.

22.     The Debtors have no valid claims (as such term is defined in section 101(5) of the Bankruptcy Code) or causes of action against the Prepetition Second Lien Lenders with respect to the Prepetition Second Lien Loan Documents, the  Prepetition Second Lien Obligations, the Prepetition Second Liens, or otherwise, whether arising at law or at equity, including, without limitation, any challenge, recharacterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 510, 541 or 542 through 553 of the Bankruptcy Code.

   *c.*     ***Prepetition Intercreditor Agreement***

23.     The relative rights and priorities of the Prepetition Liens are set forth in and governed by that certain *Intercreditor and Subordination Agreement*, dated as of November 16,

2016 (as amended, restated, supplemented or modified from time to time, collectively, the "Prepetition Intercreditor Agreement"), by and among the Prepetition First Lien Agent and the Prepetition Second Lien Agent, and acknowledged by the Loan Parties.

24.    As of the Petition Date, to Debtors' knowledge, and other than as permitted under the Prepetition Loan Documents, there were no security interests or liens on the Prepetition Collateral other than the Prepetition Liens.

25.    Upon the entry of the Final DIP Order and subject to the rights set forth in Paragraph 26 of the Interim DIP Order, the Debtors and their non-debtor subsidiaries (the "Non-Debtor Subsidiaries" and together with the Debtors, the "Katy Entities") will forever, unconditionally and irrevocably release, discharge and acquit the DIP Lender and the Prepetition Second Lien Secured Parties, and each of their respective successors, assigns, affiliates, subsidiaries, parents, officers, shareholders, directors, employees, attorneys and agents, past, present and future, and their respective heirs, predecessors, successors and assigns (collectively, the "Releasees") of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including, without limitation, reasonable attorneys' fees), debts, liens, actions and causes of action of any and every nature whatsoever, whether arising in law or otherwise, and whether or not known or matured, arising out of or relating to, as applicable, the DIP Facility, the DIP Loan Documents and/or the transactions contemplated hereunder or thereunder including, without limitation, (A) any so-called "lender liability" or equitable subordination claims or defenses, (B) any and all claims and causes of action arising under the Bankruptcy Code, and (C) any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of any and all liens securing the DIP, DIP Obligations, Prepetition Second Liens and Prepetition Second Lien Obligations (as each of the foregoing

terms is defined herein).  Upon the entry of the Final DIP Order and subject to the rights set forth in Paragraph 26 of the Interim DIP Order, the Katy Entities will further waive and release any defense, right of counterclaim, right of set-off or deduction to the payment of the Prepetition Second Lien Obligations and the DIP Obligations that the Debtors now have or may claim to have against the Releasees, arising out of, connected with or relating to any and all acts, omissions or events occurring prior to the Bankruptcy Court entering the DIP Orders.

**C.    The Debtors' Need for Use of Cash Collateral and Postpetition Financing**

26.    In order to operate during these chapter 11 cases, the Debtors will need to utilize Prepetition Collateral (including Cash Collateral) and obtain additional postpetition financing. Without the immediate use of Cash Collateral and the funds available under the DIP Facility, the Debtors would not be able to pay operating expenses, including, without limitation, amounts coming due to vendors and employees as well as other obligations, such as employee benefits, rent, utilities, and various other items reflected in the DIP Budget.[2]  Without immediate use of the Cash Collateral and the funds available under the DIP Facility, the Debtors' estates will be immediately irreparably harmed.

27.    As discussed in greater detail below, the use of Cash Collateral and entry into each of the DIP Loan Documents, including the DIP Credit Agreement, is necessary to maintain the value of the Debtors' businesses as a going concern.  Accordingly, the Debtors, in the sound exercise of their business judgment, and in consultation with their advisors in the discharge of their fiduciary duties, determined that the sizing, structure, and financial support available under the DIP Facility offered by the DIP Lender will provide the Debtors with the needed liquidity, on

---

[2]    A true and correct copy of the DIP Budget is attached to this Motion as **Exhibit D**.

the best available terms, required for a smooth transition into these chapter 11 cases and the continued operation by the Debtors of their businesses.

## <u>RELIEF REQUESTED</u>

28.    In the ordinary course of business, the Debtors use cash on hand and cash flow from their operations to fund their liquidity needs and operate their businesses.  In addition, the Debtors require access to sufficient liquidity to fund these chapter 11 cases in order to successfully effectuate the sale transaction.  Postpetition financing and the use of Cash Collateral are necessary to provide the Debtors with sufficient liquidity to maintain ongoing day-to-day operations, ensure proper and timely fulfillment of customer orders, and fund working capital needs.  Absent use of the Cash Collateral and funds available under the DIP Financing, the Debtors would be forced to liquidate, to the immediate substantial detriment of all constituencies, and irreparably harm their estates and creditors.

29.    By this Motion, the Debtors seek entry of the DIP Orders and Cash Collateral Orders granting, among other things, the following relief:

a)  authorizing the Debtor Loan Parties to enter into the DIP Facility, which is a superpriority, secured, new money, non-amortizing, multiple-draw term loan facility in the aggregate principal amount of up to $7.5 million ("<u>Commitment</u>"), consistent with the terms and conditions of the DIP Loan Documents;

b)  upon the entry of the Interim DIP Order and the closing of the DIP Facility, authorizing the Debtor Loan Parties to obtain from the DIP Lender, during the interim period pending a final hearing on the Motion as required by Bankruptcy Rule 4001 (the "<u>Final Hearing</u>"), up to $4.5 million of the Commitment (the "<u>Interim DIP Loan</u>") consistent with the terms and conditions of the DIP Loan Documents and DIP Budget, subject to Permitted Variances;

c)  approving the DIP Credit Agreement and authorizing the Debtor Loan Parties to enter into and deliver and perform under all other DIP Loan Documents;

d)  authorizing the use of Prepetition Collateral, including the Encina Cash Collateral and VPC Cash Collateral, on an interim basis until the date that the

Final DIP Order and Final Cash Collateral Order have been entered (the "Interim Period"), in which the Prepetition First Lien Secured Parties and Prepetition Second Lien Secured Parties, respectively, assert interests;

e) granting to the DIP Lender the DIP Liens and the DIP Superpriority Claims (each as defined in the Interim DIP Order and discussed below);

f) granting adequate protection to the Prepetition Secured Parties, as provided in the Interim DIP Order and Interim Cash Collateral Order (collectively, the "Interim Orders");

g) modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents;

h) waiving any applicable stay, including under Bankruptcy Rule 6004, and provision for effectiveness of the DIP Orders and Cash Collateral Orders;

i) scheduling the Final Hearing on this Motion to consider entry of the Final DIP Order and Final Cash Collateral Order, granting the relief requested in this Motion on a final basis; and

j) approving the form of notice with respect to the Final Hearing.

## SUMMARY OF PRINCIPAL TERMS OF DIP FACILITY

30. Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, the following is a concise summary of the proposed material terms of the DIP Loan Documents and the DIP Orders.[3]

| Borrowers<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | **Debtor Loan Parties**: Katy Industries, Inc., Continental Commercial Products, LLC, FTW Holdings, Inc., and Fort Wayne Plastics, Inc.<br><br>**Non-Debtor Loan Parties**:  2155735 Ontario Inc. and CCP Canada Inc.<br><br>See DIP Credit Agreement, Recitals |
|---|---|
| **DIP Lender**<br><br>*Bankruptcy Rule* | Jansan Acquisition, LLC |

---

[3]   Capitalized terms used in this summary but not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Loan Documents, DIP Orders, and Cash Collateral Orders, as applicable.  A copy of the DIP Credit Agreement is attached hereto as **Exhibit B** and is incorporated herein by reference. The summary above is qualified in its entirety by reference to the applicable provisions of the DIP Loan Documents, DIP Orders, and Cash Collateral Orders.  To the extent of any inconsistency or conflict between this concise statement and the provisions of the DIP Loan Documents, DIP Orders, and Cash Collateral Orders, the provisions of the DIP Loan Documents, DIP Orders, and Cash Collateral Orders, as applicable, shall control.

| | |
|---|---|
| *4001(c)(1)(B)* | <u>See</u> DIP Credit Agreement, Recitals |
| **Borrowing Limits**<br><br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Local Bankruptcy Rule 4001-2(a)(ii)* | The DIP Facility is a secured, superpriority, debtor in possession, new money, non-amortizing, multiple draw term loan facility in the aggregate principal amount of $7,500,000.  Loans under the DIP Facility shall be available in up to four installments, subject to the applicable conditions to borrowing thereunder.  Upon the entry of the Interim DIP Order and the closing of the DIP Facility on the closing date, subject to satisfaction of the applicable conditions to borrowing thereunder, up to $4,500,000 of the Commitment shall be made available by the DIP Lender pursuant to the Initial DIP Budget, subject to Permitted Variances.  Upon the entry of the Final DIP Order, subject to the applicable conditions to borrowing thereunder, the balance of the Commitment shall be made available in up to three installments pursuant to the DIP Budget (as defined in the DIP Credit Agreement) then in effect.<br><br><u>See</u> DIP Credit Agreement, Art. II, Section 2.01 |
| **Interest Rates**<br><br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Local Bankruptcy Rule 4001-2(a)(ii)* | "Current Interest Rate" is a rate per annum equal to LIBOR plus 15% per annum.<br><br>"Default Rate" is a rate equal to the Current Interest Rate plus 2% per annum.<br><br><u>See</u> DIP Credit Agreement, Definitions |
| **Expenses and Fees**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | **DIP Fees:** The Debtors will pay all fees, expenses and other amounts payable under the DIP Loan Documents, including an upfront fee in the amount of $187,500, all recording fees, fees and expenses of the DIP Lender's counsel, and all of the other fees and all out-of-pocket costs and expenses of the DIP Lender.<br><br>**Letter of Credit Fees**:  Upon entry of the Interim DIP Order and the initial funding under the DIP Term Facility, the Debtors shall pay in cash all accrued and unpaid interest and Letter of Credit Fees (as defined in the Prepetition First Lien Credit Agreement) owing to the Prepetition First Lien Secured Parties.<br><br><u>See</u> Interim DIP Order, Paragraphs 5 and 6 |

| | |
|---|---|
| **Maturity**<br><br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Local Bankruptcy Rule 4001-2(a)(ii)* | "<u>Maturity Date</u>" means the earliest date to occur of: (i) one hundred and fifty (150) days following the Petition Date; (ii) the consummation of any sale of all or substantially all of the Collateral pursuant to Section 363 of the Bankruptcy Code or otherwise; (iii) the Final DIP Orders have not been entered within forty-five (45) calendar days after the Petition Date; (iv) the acceleration of any portion of the Obligations and the termination of the Commitment upon the occurrence of an Event of Default; and (v) the effective date of any plan of reorganization that is filed in the Cases and confirmed pursuant to an order entered by the Bankruptcy Court .<br><br><u>See</u> DIP Credit Agreement, Definitions |
| **DIP Collateral**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | Each Loan Party grants to the DIP Lender a security interest in and continuing lien on all of such Loan Party's right, title and interest in, to and under all assets of such Loan Party, including, subject to entry of the Final DIP Order, the Avoidance Action Proceeds.<br><br><u>See</u> Interim DIP Order, Paragraph 9 |
| **DIP Liens/Super Priority Administrative Claim Status**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(i)*<br><br>*Bankruptcy Rule 4001(c)(1)(B)(iii)* | **DIP Liens:** The DIP Obligations (i) shall be secured by first priority security interests in and liens and mortgages in favor of the DIP Lender upon all of the Debtor Loan Parties' rights, title and interest to or in the DIP Collateral not otherwise subject to Permitted Priority Liens; and (ii) shall be secured by valid, enforceable, non-avoidable, and fully perfected security interests in and liens and mortgages in favor of the DIP Lender upon all Debtor DIP Collateral that also constitutes Prepetition Collateral, which liens shall be (x) junior to the Prepetition First Liens and the Replacement First Liens (as such terms are defined in the Interim Cash Collateral Order) on such Debtor DIP Collateral and (y) senior to and prime the Prepetition Second Liens, Adequate Protection Second Liens and any other liens that are not Permitted Priority Liens on such Debtor DIP Collateral. The DIP Liens shall be subordinate to the Carve-out.<br><br>**DIP Superpriority Claims:** All DIP Obligations shall constitute joint and several allowed superpriority administrative expense claims against the Debtor Loan Parties with priority over all other administrative claims against the Debtor Loan Parties, which allowed claims (the "<u>DIP Superpriority Claims</u>") shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which DIP Superpriority Claims shall be payable from and have recourse to all pre- and postpetition property of the Debtor Loan Parties and all proceeds thereof (including, effective upon entry of the Final DIP Order, Avoidance Action Proceeds), subject only to the Liens thereon, the Carve-Out and the adequate protection Superpriority Claims granted to the Prepetition First Lien Agent pursuant to the Cash Collateral Orders. Subject to and effective only upon the entry of the Final DIP Order, the DIP Superpriority Claims may be paid out of the proceeds or property recovered, unencumbered or otherwise, that is the subject of successful claims and causes of action under Chapter 5 of the Bankruptcy Code and similar laws, whether by judgment, settlement or |

otherwise (collectively, the "<u>Avoidance Actions</u>" and any proceeds thereof and property received thereby, the "<u>Avoidance Action Proceeds</u>").

<u>See</u> Interim DIP Order, Paragraphs 8 and 10

| | **Interim Cash Collateral Order**<br><br><u>See</u> Interim Cash Collateral Order, Paragraph 36 | **DIP Credit Agreement**<br><br>See DIP Credit Agreement, Art. VII, Section 7.26 |
|---|---|---|
| | | On or before the Closing Date (or such later date as DIP Lender may agree, in writing, in its discretion), Debtors shall have filed a sale motion with respect to the sale of all or substantially all of their assets (the "<u>363 Sale</u>"), seeking the Bankruptcy Court's approval of certain bidding procedures and Jansan Acquisition, LLC as the stalking horse bidder for the 363 Sale, in each case, in form and substance acceptable to DIP Lender. |
| **Milestones**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | On or before the earlier of (i) the date that is 60 days after the Petition Date or (ii) the date of the Final Hearing (or such later date as Prepetition First Lien Agent shall agree in writing), Debtors will obtain an order of the Bankruptcy Court approving the bidding procedures and the Stalking Horse Purchaser as the stalking horse bidder for the sale of all or substantially all of their assets in accordance with the Stalking Horse Asset Purchase Agreement (the "<u>Sale</u>," and such order, the "<u>Bid Procedures Order</u>"). | On or before the date that is **30 days** after the Petition Date (or such later date as DIP Lender may agree, in writing, in its discretion), Debtors will obtain an order of the Bankruptcy Court satisfactory to DIP Lender approving the bidding procedures and Jansan Acquisition, LLC as the stalking horse bidder for the 363 Sale (the "<u>Bid Procedures Order</u>"). |
| | On or before the date that is 83 days after the Petition Date (or such later date as Prepetition First Lien Agent may agree in writing), Debtors shall have commenced an auction if any qualified bid (to be defined in the Bid Procedures Order) is submitted prior to the bid deadline set forth in | On or before the date that is **53 days** after the Petition Date (or such later date as DIP Lender may agree, in writing, in its discretion), Debtors shall have commenced an auction if any qualified bid (to be defined in the Bid Procedures Order) is submitted prior to the bid deadline set forth in the Bid Procedures |

| | | |
|---|---|---|
| | the Bid Procedures Order. | Order. |
| | On or before the date that is 90 days after the Petition Date (or such later date as Prepetition First Lien Agent may agree in writing), the Bankruptcy Court shall have entered an order, which shall be in form and substance reasonably acceptable to Prepetition First Lien Agent, approving the Sale (the "<u>Sale Order</u>"). | On or before the date that is **60 days** after the Petition Date (or such later date as DIP Lender may agree, in writing, in its discretion), the Bankruptcy Court shall have entered an order, which shall be in form and substance acceptable to DIP Lender, approving the 363 Sale. |
| | On or before the date that is 120 days after the Petition Date (or such later date as Prepetition First Lien Agent shall agree in writing), the sale transaction approved by the Sale Order shall have closed and the Prepetition First Lien Debt shall have been paid in full in cash and on a final and indefeasible basis, unless otherwise satisfied in the sole discretion of Prepetition First Lien Agent. | On or before the date that is **10 days** after the Sale Order becomes a Final Order (as defined in the Stalking Horse Asset Purchase Agreement (as defined in the Cash Collateral Orders)) (or such later date as DIP Lender shall agree, in writing, in its sole discretion), the 363 sale transaction approved by the Sale Order shall have closed and the Obligations shall have been paid in full in cash or otherwise satisfied in the sole discretion of DIP Lender. |
| **Events of Default**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | The DIP Loan Documents contain events of default customary for transactions and debtors of this type, including any failure to satisfy covenants and upon the occurrence of certain bankruptcy-related events.<br><br><u>See</u> DIP Credit Agreement, Art. IX, Section 9.01 | |
| **Carve Out**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | "Carve-Out" shall mean: (i) all fees required to be paid (a) to the Clerk of the Bankruptcy Court and (b) to the Office of the United States Trustee under 28 U.S.C. § 1930(a); (ii) prior to the Carve-Out Trigger Date (as defined below), to the extent allowed at any time by the Bankruptcy Court and subject to the DIP Budget, all accrued and unpaid fees and expenses incurred by professionals retained by the Debtors and one official committee of creditors (collectively, the "<u>Retained Professionals</u>"); (iii) prior to or after the Carve-Out Trigger Date the "Transaction Fee" payable to Lincoln pursuant to its engagement letter and (iv) after the Carve-Out Trigger Date, to the extent allowed by the Bankruptcy Court, all unpaid fees and expenses incurred by the Retained Professionals in an aggregate amount not to exceed $500,000 to be funded as DIP Loans.  All amounts of the Carve-Out that have not been funded or deposited into the Professional Fee Account as of the Carve-Out Trigger Date shall be required to be funded from DIP Loans, the DIP Loan Proceeds Account and from DIP Collateral.  "Carve-Out Trigger Date" means the earlier of (i) the occurrence of the Cash Collateral Use Termination Date and (ii) the date on which the DIP Lender provides written notice to the Borrower Agent (as defined in the DIP Credit | |

<table>
<tr>
<td></td>
<td>Agreement) that an Event of Default (as defined in the DIP Credit Agreement) has occurred and has triggered the Carve-Out.

The Carve-Out shall be senior to all liens and claims securing the DIP Obligations, the Prepetition Obligations and any and all forms of adequate protection, liens, security interests and other claims granted or asserted by any party in interest.

Any funding of the Carve-Out by the DIP Lender shall be added to and made part of the DIP Obligations and secured by the DIP Collateral and otherwise entitled to the protections granted under the Interim DIP Order, the DIP Loan Documents, the Bankruptcy Code and applicable law.

<u>See</u> Interim DIP Order, Paragraph 12</td>
</tr>
<tr>
<td>**Purposes for Use of DIP Funds and Encina Cash Collateral**

*Bankruptcy Rule 4001(b)(1)(B)(ii)*</td>
<td>The Debtors seek to be authorized to use the Interim DIP Loan for (i) general working capital and operational expenses; (ii) administration of the Chapter 11 Cases; (iii) funding the Professional Fee Account (as defined below); (iv) funding cash collateral for the benefit of the Prepetition First Lien Agent to increase Availability (as defined in the Interim Cash Collateral Order) from a negative amount to zero in accordance with the Interim Cash Collateral Order; and (v) costs, expenses, and all other payment amounts contemplated in the DIP Credit Agreement, in any such case, in accordance with the DIP Budget, subject to any Permitted Variance.

Up to $50,000 in the aggregate proceeds of the DIP Loans, the DIP Collateral, the Prepetition Collateral, and the Carve-Out may be used to pay fees and expenses of the professionals retained by the Committee that are incurred in connection with investigating the matters covered by the stipulations contained in Paragraph J of the Interim DIP Order; provided, however, that subject to the entry of the Final Order, any amounts spent on such an investigation in excess of $50,000 shall not constitute administrative expenses of the Chapter 11 Cases and shall be automatically disallowed.

Prior to the Cash Collateral Use Termination Date (as defined in the Interim Cash Collateral Order), Debtors are authorized to use Cash Collateral solely: (a) to the extent of Availability, to make cash disbursements enumerated in the DIP Budget (subject to Permitted Variances), (b) to pay Allowable 506(b) Amounts when due and payable to Prepetition First Lien Agent, and (c) otherwise .in accordance with and pursuant to the terms and provisions of this Order.

<u>See</u>  Interim DIP Order, Paragraphs 3(b) and 4 and Interim Cash Collateral Order, Paragraph 1</td>
</tr>
<tr>
<td>**Borrowing Conditions**

*Bankruptcy Rule 4001(c)(1)(B)*

*Local Bankruptcy Rule 4001-2(a)(ii)*</td>
<td>The DIP Credit Agreement contain conditions precedent to credit extension customary for transactions and debtors of this type, including executed counterparts of the DIP Loan Documents, a 13-week cash flow and operating forecast with respect to the Loan Parties and their subsidiaries, contribution of all outstanding Prepetition Second Lien Debt to DIP Lender, and certain milestone dates in these chapter 11 cases.</td>
</tr>
</table>

| | |
|---|---|
| | <u>See</u> DIP Credit Agreement, Art. V, Section 5 |
| **Adequate Protection**<br><br>*Bankruptcy Rules 4001(b)(1)(B)(ii)* | The Prepetition Secured Parties shall be entitled to adequate protection of their interests in the Prepetition Collateral.<br><br>At any time Availability is a negative amount, within three (3) Business Days after written notice thereof from Prepetition First Lien Agent, Debtors shall transfer to Prepetition First Lien Agent (from amounts in the DIP Loan Proceeds Account or otherwise) for provisional application to the Prepetition First Lien Debt such amount necessary to establish positive or zero Availability; provided, that no such transfer or application shall be required if Availability is positive again as of such third Business Day; provided, further, that any such transfers and provisionally applied amounts shall be subject to remittance to Debtors later in accordance with the Interim Cash Collateral Order.  On a monthly basis, the Debtors shall also pay all unpaid and accrued Allowable 506(b) Amounts with respect to which invoices have been provided to Debtors by the Prepetition First Lien Agent.<br><br>**Replacement First Liens**:  The Prepetition First Lien Agent is granted Replacement First Liens as security for the payment of the First Lien Adequate Protection Obligations.  The Replacement First Liens: (1) are and shall be in addition to the Prepetition First Liens; (2) are and shall be First Priority Liens, subject only to Permitted Priority Liens, that are properly perfected, valid, and enforceable without any further action by Debtors, Prepetition First Lien Agent, or Prepetition First Lien Lenders and without the execution, filing or recordation of any financing statements, security agreements, mortgages or other documents or instruments; and (3) shall remain in full force and effect notwithstanding any subsequent conversion or dismissal of the Cases.<br><br>**Allowed Code § 507(b) Claim**:  As security for the payment of the First Lien Adequate Protection Obligations, the Prepetition First Lien Agent, for the benefit of itself and each of the Prepetition First Lien Lenders, shall have an allowed administrative expense claim under Code § 507(b), with priority in payment over:  (1) all costs and expenses of administration of the Case that are incurred under any provision of the Code (other than for the Carve-Out), including, without limitation, Code §§ 364, 503(b), 506(c), 507(a),  or 552(b); and (2) the claims of any other party in interest under Code § 507(b).<br><br><u>See</u> Interim DIP Order, Paragraphs 14 and Interim Cash Collateral Order, Paragraph 4 |
| **Waiver of Marshaling Doctrine and Equities of Case Exception**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(viii)* | The Final DIP Order and Final Cash Collateral Order will provide for the waiver of the "marshalling" doctrine and the "equities of the case" exception set forth in section 552(b) of the Bankruptcy Code. |
| **Modification of** | The automatic stay of Code § 362 is modified with respect to Prepetition Secured Parties and DIP Lender to the extent necessary to effectuate the |

| | |
|---|---|
| **Automatic Stay**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(iv)* | provisions of the Cash Collateral Orders and DIP Orders.<br><br><u>See</u> Interim DIP Order, Paragraph 19 and Interim Cash Collateral Order, Paragraph 6(c) |
| **Modification of Authority to file a Plan**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(v)* | The Debtors will not, without the DIP Lender's consent (in its sole discretion), propose, file, consent to, cooperate with, solicit votes with respect to any chapter 11 plan or debtor in possession financing unless such plan or financing would indefeasibly pay in full in cash all DIP Claims.<br><br>Subject to the automatic stay provision in Paragraph 16 of the Interim DIP Order, upon any Event of Default, the Debtors agree that section 1121(c) of the Bankruptcy Code shall be modified solely to permit the DIP Lender to file and solicit acceptances of a plan.<br><br><u>See</u> Interim DIP Order, Paragraphs J(ix) and (xi) |
| **Indemnification**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(ix)* | The DIP Credit Agreement provides for the Loan Parties to indemnify and hold harmless the DIP Lender and its related parties from any and all losses, claims, damages, liabilities and related expenses incurred by the indemnitees.<br><br><u>See</u> DIP Credit Agreement, Section 11.04(b) |
| **Section 506(c) Waiver**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(x)* | The Final DIP Order and Final Cash Collateral Order will provide for the waiver of claims under section 506(c) of the Bankruptcy Code upon the entry of the Final DIP Order and Final Cash Collateral Order. |
| **Lien on Avoidance Actions**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(xi)* | The DIP Orders provide that the DIP Superpriority Claims may be paid out of avoidance action proceeds upon the entry of the Final DIP Order.<br><br><u>See</u> Interim DIP Order, Paragraph 8 |

## **HIGHLIGHTED PROVISIONS UNDER LOCAL RULE 4001-2(A)(1)**

31.     The Interim Orders include certain terms that constitute material provisions requiring explicit disclosure under the Local Rules.[4]  The provisions described in Local Rule 4001-2(a)(i), to the extent applicable, are set forth at the following sections of the Interim DIP Order and the Interim Cash Collateral Order:

---

[4]       While the Debtors have attempted to highlight the provisions required by the Bankruptcy Rules and Local Rules, as well as certain other material provisions, the Debtors reserve the right to supplement this list at the hearing to consider this Motion on an interim basis.

a.   **Local Rule 4001-2(a)(i)(A) – Cross Collateralization.**  Neither the Interim DIP Order, the Interim Cash Collateral Order, nor the DIP Credit Agreement provides for cross-collateralization.

b.   **Local Rule 4001-2(a)(i)(B) – Validity, Perfection, and Amount of Prepetition Liens**.  The Debtors acknowledge, agree, admit, and stipulate to various matters, including, the validity, perfection, and priority of the liens securing the prepetition indebtedness, subject to challenge by parties in interest in accordance with the timeline mandated by Local Rule 4001-2(a)(i)(B).  *See* Interim DIP Order ¶ J; Interim Cash Collateral Order ¶ C.

c.   **Local Rule 4001-2(a)(i)(C) – Section 506(c) Waiver.**  The Interim Cash Collateral Order contains notice that the Debtors shall seek approval at the Final Hearing of a waiver of any right to surcharge against the Collateral pursuant to section 506(c) of the Bankruptcy Code or otherwise.  Further, the DIP Credit Agreement provides, in relevant part, for an event of cross-default in the event of the entry of a final non-appealable order in the chapter 11 cases charging any of the Collateral under Section 506(c) of the Bankruptcy Code against the DIP Lender.  *See* Interim Cash Collateral Order ¶ 4(f); DIP Credit Agreement ¶ 9.01(f)(x).

d.   **Local Rule 4001-2(a)(i)(D) – Liens on Avoidance Actions.**  The DIP Superpriority Claims shall be payable from and have recourse to all pre- and postpetition property of the Debtor Loan Parties and all proceeds thereof (including, effective upon entry of the Final DIP Order, Avoidance Action Proceeds (defined below)), subject only to the Liens thereon, the Carve-Out and the adequate protection Superpriority Claims granted to the Prepetition First Lien Agent pursuant to the Cash Collateral Orders, the DIP Liens shall attach to any proceeds or property recovery in respect of any avoidance actions.  Subject to the entry of a Final Cash Collateral Order, Avoidance Action Proceeds (as defined in the Interim DIP Order) shall serve as Postpetition First Lien Collateral.  *See* Interim DIP Order ¶ 8; Interim Cash Collateral Order ¶ 26.

e.   **Local Rule 4001-2(a)(i)(E) – Provisions Deeming Prepetition Debt to be Postpetition Debt.**  Neither the DIP Credit Agreement, the Interim DIP Order, nor the Interim Cash Collateral Order contains provisions deeming prepetition secured debt to be postpetition debt.

f.   **Local Rule 4001-2(a)(i)(F) – Disparate Treatment of Professionals Retained by the Committee.**  Neither the DIP Credit Agreement, the Interim DIP Order, nor the Interim Cash Collateral Order contains any provision for disparate treatment for professionals retained by a creditors' committee.

g. **Local Rule 4001-2(a)(i)(G) – Non-Consensual Priming.** Neither the DIP Credit Agreement, the Interim DIP Order, nor the Interim Cash Collateral Order provide for non-consensual priming.

**Local Rule 4001-2(a)(i)(H) – Provisions Affecting the Court's Power to Consider Equities of the Case.** Each Debtor Loan Party expressly waives all rights that it may have now or in the future under any statute, at common law, in equity or otherwise, to compel the Credit Parties (as defined in the DIP Credit Agreement) to marshal assets or to proceed against any Loan Party, other Person or security for the payment or performance of any Obligations before, or as a condition to, proceeding against such Borrower upon the entry of the Final DIP Order and Final Cash Collateral Order. *See* DIP Credit Agreement ¶ 2.11(b)(i); Interim Cash Collateral Order ¶ 4(j).

## BASIS FOR RELIEF

### A. The DIP Facility Should Be Approved.

32. The DIP Facility is critical to the Debtors' ability to effectuate the terms of a sale of the Debtors' businesses. As described above, virtually all of the Debtors' assets are encumbered by the liens and security interests of the Prepetition Secured Parties, there are no unencumbered funds with which the Debtors can pay ongoing, day-to-day operation expenses such as wages, rent, and utilities. The only acceptable proposal to provide the necessary financing was in the form of secured credit, with an allowance of superpriority administrative claims. The Debtors propose to obtain financing under the proposed DIP Facility by providing security interests and liens as set forth above pursuant to sections 364(c) and 364(d)(1) of the Bankruptcy Code.

33. The statutory requirement for obtaining postpetition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of the [the Bankruptcy Code]." 11 U.S.C. § 364(c); *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (authorizing superpriority administrative expenses where debtor could not

obtain credit as an administrative expense); *In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 37-39

(Bankr. S.D.N.Y. 1990) (debtor must show that it made reasonable efforts to seek other sources

of financing under §§ 364(a) and (b)); *In re Garland Corp.*, 6 B.R. 456, 461 (1st Cir. BAP 1980)

(secured credit under § 364(c)(2) authorized, after notice and a hearing, upon showing that

unsecured credit unobtainable); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa.

1987) (debtor seeking credit under § 364(c) of the Bankruptcy Code must prove that it cannot

obtain unsecured credit pursuant to § 364(b)).

34.     Where, as here, a debtor is unable to obtain unsecured credit, section 364(c)(1) of

the Bankruptcy Code provides that the debtor may obtain credit secured by an administrative

expense claim having priority "over any or all administrative expenses of the kind specified in

section 503(b) or 507(b) of [the Bankruptcy Code]." 11 U.S.C. § 364(c)(1).  As described above,

the Debtors are unable to obtain unsecured credit.  Therefore, approval of the DIP Superpriority

Claims in favor of the DIP Lender is reasonable and appropriate.  Similarly, the Debtors were

unable to obtain postpetition financing on a junior or par priority basis under section 364(c)(2) or

(3).  In addition, section 364(d)(1) of the Bankruptcy Code, which governs the incurrence of

postpetition debt by senior or "priming liens," provides that the court may, after notice and a

hearing,

> authorize the obtaining of credit or the incurring of debt secured by
> a senior or equal lien on property of the estate that is subject to a
> lien only if –
>
> (A)     the trustee is unable to obtain credit otherwise; and
>
> (B)     there is adequate protection of the interest of the holder of
> the lien on the property of the estate on which such senior
> or equal lien is proposed to be granted.

11 U.S.C. 364(d)(1).

35.     A debtor need only demonstrate by a good faith effort that credit was not available without the protections afforded to potential lenders by sections 364(c) or 364(d) of the Bankruptcy Code.  *In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986).  Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."  *Id.*; *Ames*, 115 B.R. at 40 (holding that debtor made reasonable effort to secure financing when it selected the least onerous financing option from the remaining two lenders).  Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [debtor] to conduct an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Savings Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

36.     As mentioned above, the Debtors selected the DIP Financing provided by the DIP Lender only after carefully examining all available options.  In the end, it was not feasible for the Debtors to obtain from any other party a loan on equal or better terms that afforded the Debtors sufficient liquidity to operate their businesses.  In consultation with their professionals, the Debtors determined, in the exercise of their business judgment, that the DIP Lender provided the best source of funding under all the circumstances, especially because it (a) would minimize the costs and expenses associated with a contested priming fight and (b) would enable the Debtors to pursue a sale process that would maximize the value of the Debtors' estates.  Accordingly, the Debtors commenced vigorous, arms'-length and good faith negotiations with the DIP Lender for the DIP Financing.

37.     As noted above, the Debtors suffer from severely constrained liquidity as a result of, among other things, decreasing availability under their Prepetition Loan Documents.  The Debtors selected the DIP Facility because the terms and costs were comparable to the terms

offered by the Prepetition First Lien Secured Parties, but the DIP Facility provides the Debtors additional liquidity.  An immediate infusion of liquidity is required in order to permit the Debtors to stabilize their operations and cash flow, which will maximize the potential value of their assets to their estates and creditors.  Absent such an infusion, it is likely that the Debtors will suffer immediate and irreparable harm.  Therefore, the Debtors are seeking interim approval to borrow the Interim DIP Loan, so that they may meet their working capital needs, including making payments to their employees.  In a recent case even where a debtor required immediate access to the full amount of its debtor in possession financing, the Court permitted full funding of the loan under an interim order.  *See In re Reichhold Holdings,* Case No. 14-12237 (MFW) (Bankr. D. Del. Oct. 2, 2014) (permitting debtor to borrow full amount of DIP loan on first day to pay off prepetition secured loan).  Here, the Debtors require the authority to borrow only a portion of the Commitment to make other payments required to be made on or about the Petition Date, which liquidity would not otherwise be available to the Debtors.

38.    For these reasons and the reasons set forth above, the DIP Facility should be approved.

**B.    The Use of Cash Collateral is Warranted and Should be Approved.**

39.    Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(c)(2) provides that:

The trustee may not use, sell or lease cash collateral . . .  unless –

(A)    each entity that has an interest in such collateral consents; or

(B)    the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).  Section 363(e) provides for adequate protection of interests in property when a debtor uses cash collateral.

40.     Substantially all of the Debtors' cash, including, without limitation, all cash and other amounts on deposit or maintained by the Debtors in any bank accounts, as well as any cash proceeds derived from the disposition of any Prepetition Collateral, constitute proceeds of the Prepetition Collateral and, therefore are cash collateral of the Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral").

41.     The Debtors rely on cash on hand and cash generated from their operations to fund working capital, capital expenditures, research and development efforts, and for other general corporate purposes. During these chapter 11 cases, the Debtors will need this operating revenue to satisfy payroll, pay suppliers, vendors, and utility providers, honor obligations to their customers, and make any other payments that are essential for the continued management, operation and preservation of the Debtors' businesses.  The ability to satisfy these expenses when due is essential to the Debtors' smooth transition into the chapter 11 cases and continued operation of their businesses during the pendency of these chapter 11 cases.

42.     An inability to use funds during these chapter 11 cases could cripple the Debtors' business operations.  Indeed, without access to Cash Collateral, the Debtors and their estates would suffer immediate and irreparable harm.

43.     The Prepetition Secured Parties have consented to the Debtors' use of Cash Collateral, subject to the adequate protections described herein, and pursuant to the terms of the DIP Orders and the Cash Collateral Orders.  Accordingly, the Debtors respectfully submit that the use of Cash Collateral is in the best interests of the Debtors' estates and should be approved.

C.    **The Prepetition Secured Parties Are Adequately Protected Under Sections 364(d) and 361 of the Bankruptcy Code.**

44.    In connection with the DIP Financing, the Debtors propose providing the Prepetition Secured Parties with adequate protection in accordance with sections 364(d) and 361 of the Bankruptcy Code.[5]   To that end, the Debtors and the Prepetition Secured Parties have negotiated, and the Debtors request that the Court approve, as of the Petition Date, certain protections of the Prepetition Secured Parties' interests in the Prepetition Collateral from any diminution in value of each of their respective interests in the Prepetition Collateral resulting from the Debtors' use, sale or lease of such collateral, and the imposition of the automatic stay.

45.    Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor in possession may not use cash collateral without the consent of the secured party or court approval.  Section 363(e) provides that, upon request of an entity that has an interest in property to be used by a debtor, the court shall prohibit or condition such use as necessary to provide adequate protection of such interest.  Under section 364(d), a debtor may obtain credit secured by a senior or equal lien if an existing secured creditor's interest in the collateral security is adequately protected.

46.    What constitutes adequate protection is decided on a case-by-case basis.  *See In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("[t]he determination of adequate protection is a fact-specific inquiry"); *In re Realty Southwest Assocs.*, 140 B.R. 360, 366 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986); *see also In re O'Connor*, 808 F.2d 1393, 1396-97 (10th Cir. 1987); *In re Martin*, 761 F.2d 472, 474 (8th Cir. 1985).  By adequate protection, the Bankruptcy Code seeks to shield a secured creditor from diminution in the value of its interest in

---

[5]    Bankruptcy Code section 364(d) requires that adequate protection be provided where the liens of secured creditors are being primed to secure the obligations under a debtor-in-possession financing facility.  *See* 11 U.S.C. § 364(d).

the particular collateral during the period of use.  *See In re 495 Central Park Avenue Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. at 736; *In re Hubbard Power & Light*, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996).  When priming of liens is sought pursuant to section 364(d) of the Bankruptcy Code, courts also examine whether the prepetition secured creditors are provided adequate protection for the value of their liens.  *Beker*, 58 B.R. at 737.  Because all of these tests are satisfied here and the Debtors have met all of their obligations under section 364 of the Bankruptcy Code, among other bases as demonstrated by the consensual nature of the relief requested by this Motion, the Motion should be granted and the DIP Loan Documents and the adequate protection set forth in the DIP Orders and the Cash Collateral Orders should be approved.

47.    Section 361(2)-(3) of the Bankruptcy Code expressly describes replacement liens and administrative claim status as appropriate forms of adequate protection.  Thus, the provision of these forms of adequate protection is appropriate.  Further, payment of reasonable and documented out-of-pocket fees, costs and expenses, subject to review by parties in interest, often serves as a form of adequate protection for secured creditors.  Agreeing to pay the reasonable and documented out-of-pocket fees, costs and expenses offers meaningful additional protection to any diminution in the value of the Prepetition Collateral.  Accordingly, the Debtors believe that the adequate protection described above and in the Interim Orders are fair, reasonable and sufficient to protect any diminution in the value of the Prepetition Secured Parties' interests in the Prepetition Collateral during the period their collateral is used by the Debtors.

D.    **The DIP Financing is Necessary to Preserve the Value of the Debtors' Estates.**

48.    The Debtors must immediately instill confidence in their employees, vendors, service providers and customers, reassuring them that these chapter 11 cases will not erode their

relationships with the Debtors or the overall value of the Debtors' estates.  The Debtors believe they must provide to their constituents assurances as to their ability to seamlessly transition into chapter 11, operate in a "business as usual" fashion, but with increased liquidity, and ultimately sell their businesses in a successful and expedited manner.  The DIP Financing will provide the working capital necessary to allow the Debtors to, among other things, continue operating their businesses in the ordinary course, which in turn will help maintain value for the benefit of all creditors and parties in interest.

49.    The initial success of the chapter 11 cases at the outset depends on the comfort level of the Debtors' constituents, which in turn depends upon the Debtors' ability to minimize the disruption of the bankruptcy filings.  Approval and implementation of the DIP Financing ensures continued functioning of the Debtors, and together with approval of the Debtors' maintenance of their cash management system, will preserve the going concern value of their estates.

**E.**    **The Terms of the DIP Financing Are Fair, Reasonable and Appropriate.**

50.    After appropriate investigation and analysis, the Debtors, in consultation with their advisors, have concluded that the DIP Financing presents the best route available under the circumstances.  Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision fails the arbitrary and capricious standard. *See Ames* 115 B.R. at 40 (courts should approve borrowings pursuant to 364(c) and (d) if the debtors was within its business judgment); *In re Mid-State Raceway, Inc.*, 323 B.R. 40, 58-59 (Bankr. N.D.N.Y. 2005) (same); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that approval of interim loan, receivables

facility and asset-based facility "reflect[ed] sound and prudent business judgment...[was] reasonable under the circumstances and in the best interest of [the debtor] and its creditors").

51.     Indeed, "more exacting scrutiny [of the debtor's business decisions] would slow the administration of the Debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

52.     The terms and conditions of the DIP Financing are fair and reasonable and were negotiated by the parties in good faith and at arms' length.  In the reasonable exercise of the Debtors' business judgment, the DIP Financing is the best financing option available under the present circumstances.  As discussed above, the Debtors, with the assistance of their advisors, assessed their financing needs and the DIP Financing proposal.  After fully considering the DIP Financing proposals, and whether other more advantageous financing alternatives were available to the Debtors, and in consideration of the Prepetition Secured Parties' respective rights under the Prepetition Intercreditor Agreement and the potential of significant disruption to the chapter 11 cases, the Debtors decided to accept the DIP Financing with the DIP Lender.  The Prepetition Secured Parties are party to the Prepetition Intercreditor Agreement, which grants the parties certain rights that if exercised would have significantly disrupted the Debtors' chapter 11 cases. Accordingly, the Debtors determined to select a DIP financing based not only on an analysis of the competing economic terms but also with an eye toward which proposal would eliminate or minimize such potential disruption.

53.     Further, the proposed DIP Financing subjects the security interests and administrative expense claims of the DIP Lender to the Carve-Out, thereby ensuring that in an

Event of Default under the DIP Credit Agreement, the Debtors' estates or other parties-in-interest are not directly or indirectly deprived of possible rights and powers by restricting the services for which professionals may be paid in these cases.  In *Ames Dept. Stores*, the court found such carve-outs for professional fees not only reasonable but necessary to ensure that official committees and debtors' estates can retain assistance from counsel.  *See Ames*, 115 B.R. at 38, 40 (observing that courts insist on carve-outs for professionals representing parties-in-interest because "absent such protection, the collective rights and expectation of all parties-in-interest are sorely prejudiced").

### F.     The Section 506(c) and 552(b) Waivers Should Be Approved

54.     The Court should approve the Debtors' waivers of any right to surcharge any or all of the Prepetition Secured Parties or the DIP Lender, their respective claims, or their respective collateral and to invoke the "equities of the case" exception of section 552(b). Agreeing to the waivers allowed the Debtors to obtain critical financing under the DIP Facility. Further, such waivers and provisions are standard and customary under financings between sophisticated parties. As one court noted in discussing such waivers, "the Trustee and Debtors-in-Possession in this case had significant interests in asserting claims under § 506(c) and have made use of their rights against the Lender under § 506(c) by waiving them in exchange for concessions to the estate (including a substantial Carve Out for the benefit of administrative creditors)." *In re Molten Metal Tech., Inc.*, 244 B.R. 515, 527 (Bankr. D. Mass. 2000); *see also Ansel Props., Inc. v. Nutri/Sys. of Fla. Assocs. (In re Nutri/Sys. of Fla. Assocs.)*, 178 B.R. 645, 649 (E.D. Pa. 1995) (noting that debtor had waived § 506(c) rights in obtaining debtor in possession financing).

**G.      Modification of the Automatic Stay Is Appropriate.**

55.      Section 362 of the Bankruptcy Code provides for an automatic stay upon the filing of a bankruptcy petition.  The DIP Credit Agreement and DIP Loan Documents require a modification of the automatic stay to implement the terms of the DIP Financing.  Stay modification provisions of this kind are ordinary and standard features of post-petition debtor-in-possession financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances.  As noted above, the Debtors are unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code in an amount sufficient and readily available to maintain ongoing operations nor have the Debtors been able to obtain debtor in possession financing on terms more favorable than those proposed herein.  The terms and conditions of the DIP Financing, including the modification of the automatic stay described above, are fair and reasonable, and were negotiated extensively by well-represented parties in good faith and at arms' length.  In these circumstances, and importantly, in light of the material benefits afforded to the Debtors by the DIP Financing, the modification of the automatic stay is more than warranted.

**H.      Interim Approval of the DIP Financing and Use of Cash Collateral Should Be Granted Immediately.**

56.      The Debtors bring this Motion to obtain authorization to use Cash Collateral and borrow under the DIP Credit Agreement on an expedited basis, due to the immediate and irreparable harm that would be suffered by the Debtors' estates were the Debtors unable to obtain the financing needed to sustain their businesses.  The Debtors have an immediate need to obtain the DIP Financing and use Cash Collateral to permit them, in addition to financing the administration of these chapter 11 cases and efforts toward a 363 sale of assets, to (a) operate the businesses, (b) maintain business relationships with vendors, suppliers and customers, including

several foreign suppliers that are critical to the Debtors' uninterrupted continued operations, (c) pay employee wages in the ordinary course, (d) make necessary capital expenditures, and (e) satisfy other working capital and operational needs, all of which are necessary to preserve the going-concern value of the Debtors.

57.    Without the use of Cash Collateral and access to the additional liquidity in the amount of $4.5 million on an interim basis and $7.5 million on the final basis made available under the DIP Facility, the Debtors will not be able to meet their day-to-day operational needs and will have to shut down.  In such a scenario, the Debtors would have to halt their operations, which would immediately erode the overall value of their businesses.  Further, the Debtors must demonstrate to their customers and vendors that they have sufficient capital to ensure ongoing operations in the ordinary course – thereby assuaging any potential fears among their constituents that these chapter 11 cases will negatively impact them, resulting in material challenges to the Debtors' operations.  Therefore, the Debtors request approval of the DIP Financing on an expedited basis due to the immediate and irreparable harm that would be suffered by the Debtors' estates were they unable to obtain the postpetition financing.

58.    Bankruptcy Rule 4001(c)(2) permits a court to approve a debtor's request for financing during the 14-day period following the filing of a motion requesting authorization to obtain post-petition financing "only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing."  Local Rule 4001-2(b) provides that the Court may grant interim relief pending review by interested parties of proposed debtor in possession financing arrangements, including use of cash collateral, provided that such relief is limited to what is necessary to avoid immediate and irreparable harm pending a final hearing.

59.     The Debtors request that the Court conduct an expedited preliminary hearing on the Motion and authorize the entry of the Interim Orders until the Final Hearing to borrow funds in the amount of $4.5 million to be made available under the DIP Facility, which the Debtors shall use to, among other things, provide working capital for the Debtors' ongoing business operations and pay expenses for these chapter 11 cases.  This authority will allow the Debtors to maintain a stable business environment and avoid immediate and irreparable harm, pending the Court's final decision at the Final Hearing.

60.     Absent this Court's approval of the interim relief sought in this Motion, the Debtors face a substantial risk of severe disruption to their business operations and irreparable damage to their relationships with customers and vendors, very likely resulting in a liquidation. The relief sought herein is critical to ensure the Debtors' businesses retain their highest and best going-concern value in advance of a 363 auction and sale.

## I.       A Final Hearing Should Be Set.

61.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable but in no event later than 25 days following the Petition Date. The Debtors request authorization to serve a copy of the signed Interim Orders, which fixes the time and date for the filing of objections, if any, by first class mail upon the Notice Parties (defined below).  The Debtors request that the Court consider such notice of the Final Hearing to be sufficient notice under Rule 4001 of the Bankruptcy Rules.

## THE REQUIREMENTS OF BANKRUPTCY RULE 6003 ARE SATISFIED

62.     Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." For the reasons discussed above, (a) authorizing the Debtors to obtain postpetition

secured financing under the DIP Facility, (b) authorizing the Debtors to use Cash Collateral, (c) granting adequate protection to the Prepetition Secured Parties, (d) scheduling a Final Hearing, and (e) modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms of the Interim Orders and the DIP Financing, as well as granting the other relief requested herein, is integral to the Debtors' ability to transition their operations into these chapter 11 cases.

63.     Failure to receive such authorization and other relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture. For the reasons discussed herein, the relief requested is necessary in order for the Debtors to operate their businesses in the ordinary course and preserve the ongoing value of their operations, maximizing the value of their estates for the benefit of all stakeholders. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

## WAIVER OF BANKRUPTCY RULE 6004(A)

64.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a).

65.     The Debtors further seek a waiver of any stay of the effectiveness of the order approving this Motion.  Pursuant to Rule 6004(h) of the Bankruptcy Rules, "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  As set forth above, the DIP Financing is essential to prevent potentially irreparable damage to the Debtors' operations, value and ability to reorganize.  Accordingly, the Debtors submit that ample cause

exists to justify a waiver of the 14-day stay imposed by Rule 6004(h) of the Bankruptcy Rules, to the extent it applies.

## **RESERVATION OF RIGHTS**

66.     Nothing contained in this Motion is intended or should be construed as an admission regarding the validity of any claim against the Debtors, a waiver of the Debtors' rights to dispute any claim, or an approval or assumption of any agreement, contract, or policy under section 365 of the Bankruptcy Code.  The Debtors expressly reserve their right to contest any claim related to the relief sought herein.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to an order of the Court is not intended to be nor should it be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## **NOTICE**

67.     Notice of this Motion shall be provided to: (a) the Office of the United States Trustee for the District of Delaware, (b) each of the Debtors' twenty (20) largest unsecured creditors on a consolidated basis, (c) counsel to the Agent for the Prepetition First Lien Lenders, (d) counsel to the Agent for the Prepetition Second Lien Lender, (e) counsel to the DIP Lender, (f) counsel to the Stalking Horse Purchaser, (g) the United States Attorney's Office for the District of Delaware, (h) the Internal Revenue Service, (i) the Securities and Exchange Commission, (j) the Banks, and (k) any  party that has requested notice pursuant to Bankruptcy Rule 2002.  As this Motion is seeking "first day" relief, notice of this Motion and any order entered in connection with the Motion will be served on all parties required by Local Rule 9013-1(m).  Due to the urgency of the circumstances surrounding this Motion and the nature of the relief in it, the Debtors respectfully submit that no further notice of this Motion is required.

**WHEREFORE**, the Debtors respectfully request that the Court enter (i) the Interim DIP

Order, substantially in the form attached to this Motion as **Exhibit A** and (ii) the Interim Cash

Collateral Order, substantially in the form attached to this Motion as **Exhibit C**, granting the

relief requested in this Motion and such other and further relief as the Court may deem proper.


Dated:  May 14, 2017                    Respectfully submitted,
        Wilmington, Delaware

                                        **DLA PIPER LLP (US)**

                                        */s/ Stuart M. Brown*
                                        Stuart M. Brown (DE 4050)
                                        1201 North Market Street, Suite 2100
                                        Wilmington, Delaware 19801
                                        Telephone:  (302) 468-5700
                                        Facsimile:  (302) 394-2341
                                        Email:  stuart.brown@dlapiper.com

                                        -and-

                                        John K. Lyons (*pro hac vice* admission pending)
                                        Daniel M. Simon (*pro hac vice* admission pending)
                                        Oksana Koltko Rosaluk (*pro hac vice* admission pending)
                                        444 West Lake Street, Suite 900
                                        Chicago, Illinois 60606
                                        Telephone:  (312) 368-4000
                                        Facsimile:  (312) 236-7516
                                        Email: john.lyons@dlapiper.com
                                                daniel.simon@dlapiper.com
                                                oksana.koltkorosaluk@dlapiper.com


                                        *Proposed Counsel to the Debtors*

**<u>Exhibit A</u>**

**(Proposed Interim DIP Order)**

**<u>Exhibit B</u>**

**(DIP Credit Agreement)**

**<u>Exhibit C</u>**

**(Proposed Interim Cash Collateral Order)**

## Exhibit D

**(DIP Budget)**