## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------------- x
                                                               :
In re:                                                         :  Chapter 11
                                                               :
       KATY INDUSTRIES, INC., et al.,¹                         :  Case No. 17-11101 (___)
                                                               :
              Debtors.                                         :  (Joint Administration Requested)
-------------------------------------------------------------- x
```

**MOTION OF DEBTORS FOR ENTRY OF ORDERS (I) (A) APPROVING AND AUTHORIZING BIDDING PROCEDURES IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL ASSETS, (B) APPROVING STALKING HORSE PROTECTIONS, (C) APPROVING PROCEDURES RELATED TO ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (D) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, AND (II) (A) APPROVING AND AUTHORIZING SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS TO THE SUCCESSFUL BIDDER FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS, (B) APPROVING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO, AND (C) GRANTING RELATED RELIEF**

The above-captioned debtors (collectively, the "Debtors"), by and through their proposed counsel, DLA Piper LLP (US), hereby move the Court for the entry of orders pursuant to sections 105(a), 363 and 365 of title 11 of the United States Code (as amended, the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1 and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"): (i)(a) approving procedures applicable to the sale of substantially all of the Debtors' assets, (b) approving Stalking Horse Protections (as defined below), (c) approving

---

¹     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, where applicable, are: Katy Industries, Inc. (7589), Continental Commercial Products, LLC (3898), FTW Holdings, Inc. (7467), Fort Wayne Plastics, Inc. (7470), Wabash Holding Corp. (9908), Katy Teweh, Inc. (9839), WII, Inc. (0456), TTI Holdings, Inc. (8680), GCW, Inc. (5610), Hermann Lowenstein, Inc. (4331), American Gage & Machine Company (7074), WP Liquidating Corp. (2310), Ashford Holding Corp. (8113), and HPMI, Inc. (4677). The corporate headquarters and the mailing address for the Debtors listed above is 11840 Westline Industrial Drive, Suite 200, St. Louis, MO 63146.

procedures related to the assumption and assignment of certain executory contracts and unexpired leases, (d) approving the form and manner of notice thereof, and (ii)(a) authorizing the sale of assets free and clear of all liens, claims, encumbrances and other interests, except as provided in the Stalking Horse Agreement or Asset Purchase Agreement (as defined below), (b) approving the assumption and assignment of certain of the Debtors' executory contracts and unexpired leases related thereto, and (c) granting related relief (the "Motion").  In support of this Motion, the Debtors submit and incorporate by reference the statements contained in the *Declaration of Lawrence Perkins in Support of First Day Pleadings* (the "First Day Declaration") filed contemporaneously herewith and further respectfully state as follows:

### Jurisdiction and Venue

1.      This Court has jurisdiction over these cases and this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware dated as of February 29, 2012.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.

3.      Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors consent to the entry of a final judgment or order with respect to the Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

### Background

4.      On May 14, 2017 (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under the Bankruptcy Code.

5.     The Debtors continue to be in possession of their properties and to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date hereof, no trustee, examiner, or official committee of unsecured creditors has been appointed in the Debtors' chapter 11 cases.  No date has been set for a creditor meeting pursuant to section 341 of the Bankruptcy Code.

6.     The Debtors in these chapter 11 cases are Katy Industries, Inc., a publicly traded Delaware corporation, and certain of its wholly-owned direct and indirect subsidiaries (collectively, the "Company").  Founded more than 50 years ago, the Company is a well-known manufacturer, importer, and distributor of commercial cleaning and consumer storage products as well as a contract manufacturer of structural foam products.  The Company distributes its products across the United States and Canada.  The Company is best known for such brands as Continental®, Huskee®, Color Guard®, Wilen®, Muscle Mop®, Contico®, Tuffbin®, and SilverWolf®, among many others.  The Company operates three manufacturing facilities located in Jefferson City, Missouri, Tiffin, Ohio, and Fort Wayne, Indiana, with its corporate headquarters located in St. Louis, Missouri.  The Company currently employs approximately 300 employees, and supplements its workforce with a significant number of additional labor employed through third parties.  The Company boasts a broad and loyal customer base with over 1,500 customers encompassing stable industry leaders, providing the Company with a sustainable platform of consumable products and a recurring revenue source.  In the fiscal year 2016, the Company generated revenues of approximately $107.9 million across its various business units.

7.     Over the years, the Company acted as an acquirer of various business units, a number of which came with substantial legacy liabilities which caused increasing strains on the

Company's liquidity.    More recently, in mid-2015, the Company encountered operational challenges primarily as a result of the move of its Bridgeton manufacturing facility (now known as the Jefferson City facility), which led to a marked decline in the Company's cash flow.  The relocation, which involved moving all manufacturing operations, caused prolonged production delays, triggered a substantial increase in outsourcing and maintenance costs, thereby reducing revenue and costing the Company millions of dollars in increased costs.    Exacerbating these issues, the synergies expected to be realized from the acquisition of the Tiffin manufacturing facility in late 2015 took longer than expected to realize, resulting in further pressures to the Company's already fragile financial state.  Both the losses associated with the Bridgeton facility relocation, and the substantial unrealized investments relating to the Tiffin facility acquisition, when combined with the Company's significant legacy liabilities, led to severely constricted liquidity available to the Company under its existing credit arrangements.  Despite numerous efforts to seek alternative financing or investments during this time, the Company was unable to overcome these obstacles, leading to the filing of these chapter 11 cases.

8.    The Debtors have determined that preserving and maximizing the value of the Company for the benefit of its customers, employees, vendors, and other stakeholders is best accomplished through the sale of substantially all of their assets.  To this end, the Debtors entered into an asset purchase agreement with Jansan Acquisition, LLC ("Jansan" or the "Stalking Horse Purchaser"), a newly created entity co-owned by Highview Capital, LLC, a third-party investor and affiliate of Victory Park Management, LLC, as administrative agent for the Company's pre-petition second lien lender.  In addition, the Debtors procured a $7.5 million debtor-in-possession financing (the "DIP Facility") from Jansan (the "DIP Lender") to provide the Debtors with sufficient liquidity to operate their businesses in chapter 11 during the pendency

- 4 -

of the sale process. With these commitments in place, and given the Company's strong portfolio of proprietary brands, and that end-user demand for the Company's products is stable and recurring, a sale process effectuated under section 363 of the Bankruptcy Code has the potential to preserve the jobs of hundreds of employees and the value of products and brands developed by the Company over the last fifty years, ultimately inuring to the benefit of all of the Debtors' stakeholders.

## **Preliminary Statement**

9.      In light of the Debtors' need to consider various strategic alternatives, the Debtors engaged Lincoln International, Inc. ("Lincoln") on March 16, 2017, as their investment banker to conduct a comprehensive marketing and sale process. Following their engagement, Lincoln worked expeditiously with the Company to prepare a teaser, confidential information presentation, buyer list, and other related diligence materials. By mid-April 2017, however, the Company's liquidity forecast had been severely impacted by lower than anticipated sales, thereby dramatically shortening the liquidity runway for the sale process.

10.      At approximately the same time, Lincoln was informed that the Stalking Horse Purchaser was contemplating an acquisition of substantially all of the Debtors' assets that would be conducted via a chapter 11 process and, to effectuate such a transaction, was also interested in providing debtor-in-possession financing to allow the Debtors to adequately market and sell their assets through chapter 11. In order to ascertain whether there were any other parties who would be interested in providing debtor in possession financing in conjunction with a potential acquisition, Lincoln immediately initiated discussions with 17 parties that could potentially move swiftly enough and have the investment flexibility to provide a competing junior debtor-in-possession financing proposal to that submitted by the Stalking Horse Purchaser. Of these

parties, 13 executed confidentiality agreement, but none were able to provide the Debtors' with a competing proposal prior to the filing of these chapter 11 cases

11.     While conducting the accelerated process to ascertain whether an alternative debtor in possession lender and/or Stalking Horse Purchaser was viable, Lincoln finalized the sale process materials, and on May 4, 2017, formally launched the broader sale process with the distribution of Confidential Information Presentations to parties, primarily strategic in nature, who had previously executed confidentiality agreements and the distribution of a teaser to a broad range of private equity funds and other financial investors.  As of May 12, 2017, Lincoln has approached a total of 154 parties, including strategic acquirers and financial acquirers with a demonstrated interest in the sector or investment strategy focused on companies undergoing operational transition and financial distress.  Of these, 48 parties, including 14 strategic buyers and 34 financial buyers, executed confidentiality agreements.

12.     As mentioned above, during this time, Lincoln and the Company's other advisors have been discussing a potential acquisition of the Company through a chapter 11 sale process by Victory Park Management, LLC ("VPC"), as administrative agent for the Company's Second Lien Lender, and Highview Capital, LLC ("Highview") a third-party investor, that would contemplate consideration comprised of cash, assumed debt and liabilities, and the credit bid of the outstanding amount owing under the Second Lien Term Credit Facility.  Given the time constraints relating to the Company's fragile liquidity position, Lincoln also focused its efforts on assisting the Debtors' CRO, management, and counsel in negotiating the Stalking Horse Agreement and related bidding procedures in connection with the commencement of these chapter 11 cases.[2]

---

[2]     In February 2017, the Debtors' board of directors delegated their authority to a Special Committee of the Board of Directors comprised of independent directors, Thomas J. Allison and John Wallis, with respect to

13.     The Debtors have determined, after extensive diligence and in consultation with their advisors and key stakeholders that maximizing the value of the Debtors' estates is best accomplished through the sale, free and clear of liens, claims and other interests, of substantially all of their assets (as described more fully herein, the "Purchased Assets").  Undertaking a sale of substantially all of the Debtors' assets represents the best available alternative for the Debtors to meet their immediate and ongoing liquidity needs, while continuing to operate in the ordinary course of business during this process for the benefit of the Debtors' customers, employees, vendors and other stakeholders.

14.     The Debtors (in this capacity, the "Sellers") entered into that certain asset purchase agreement, dated as of May 14, 2017 (together with the schedules and related documents thereto, the "Stalking Horse Agreement," a copy of which is attached hereto as Exhibit B), with Jansan Acquisition, LLC (the "Stalking Horse Purchaser"), a newly created entity co-owned by Highview and affiliates of VPC and established to hold and bid the secured claims of the Second Lien Lender under that certain Second Lien Credit and Security Agreement by and among Katy Industries, Inc., Continental Commercial Products, LLC, FTW Holdings, Inc. and Fort Wayne Plastics, Inc., each as Borrowers, 2155735 Ontario Inc., and CCP Canada Inc., as Guarantors, Victory Park Management, LLC, as Agent, and VPC SBIC I, LP and other Lenders party thereto, as Lenders (as subsequently amended, restated or supplemented from time to time, the "Second Lien Credit Agreement"), and the proposed $7.5 million secured debtor-in-possession credit facility, pursuant to which the Stalking Horse Purchaser will acquire the

---

strategic alternatives and discussions regarding a potential sale transaction.  Further, given that the Debtors' Chief Executive Officer, Robert Guerra, was offered a position with the Stalking Horse Purchaser in the event that such Sale is consummated, Mr. Guerra recused himself from any deliberations, discussions or decisions of the Board of Directors.

Purchased Assets on the terms and conditions specified therein.[3]    The sale transaction contemplated by the Stalking Horse Agreement will be subject to competitive bidding on the terms proposed below.

15.    Pursuant to the terms of the Stalking Horse Agreement, the Stalking Horse Purchaser has agreed to purchase the Purchased Assets in exchange for (i) the assumption of the Encina Obligations (as defined below); (ii) a credit bid of the amount outstanding under the proposed $7.5 million Debtor-In-Possession Credit Agreement (the "DIP Credit Agreement"), (iii) a credit bid of all outstanding amounts due and owing under the Second Lien Credit Agreement; and (iv) the assumption of certain additional liabilities (the "Stalking Horse Purchase Price").

16.    The Stalking Horse Purchaser, in making this offer, has relied upon the agreement by the Debtors to seek the Court's approval of reimbursement of the Stalking Horse Purchaser's reasonable fees, costs and expenses incurred in connection with the negotiation of the Stalking Horse Agreement and the transactions contemplated thereby through the date of termination, subject to a cap of $350,000 (the "Expense Reimbursement") and a break-up fee of $1,750,000 (the "Break-Up Fee," and together with the Expense Reimbursement, the "Stalking Horse Protections"), and in reasonable expectation that this Court would grant such relief.  The Debtors, in the exercise of their business judgment, believe that the Stalking Horse Protections are a necessary inducement for the Stalking Horse Purchaser, and will establish a "floor" for the sale of the Purchased Assets that will ultimately encourage competitive bidding and realization of the highest value for the Purchased Assets.  As such, the Stalking Horse Protections are

---

[3]    Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Stalking Horse Agreement.  In compliance with Local Rule 6004-1 and for the convenience of the reader, the salient terms of the transaction as currently set forth in the Stalking Horse Agreement have been summarized and are attached hereto as Exhibit A.

reasonable, necessary and beneficial costs of the Debtors' estates incurred in order to preserve the Debtors' assets and maximize the value to their estates.

17.     The sale of the Purchased Assets pursuant to the procedures and on the timeline proposed herein represents the best opportunity to maximize the value of the Purchased Assets for all interested parties.

## **Relief Requested**

18.     By this Motion, the Debtors request entry of an order, attached hereto as <u>Exhibit C</u> (the "<u>Bidding Procedures Order</u>"):

    a)   approving procedures for the sale of the Purchased Assets (the "<u>Bidding Procedures</u>") in the form attached to the Bidding Procedures Order as <u>Exhibit 1</u>);

    b)   approving the Stalking Horse Protections and granting them administrative expense status;

    c)   scheduling a hearing to approve the sale of the Purchased Assets on or before July 10, 2017 (the "<u>Sale Hearing</u>");

    d)   approving procedures (the "<u>Cure Procedures</u>"), as set forth below, for the assumption and assignment of certain executory contracts (the "<u>Contracts</u>") and unexpired leases (the "<u>Leases</u>") of the Debtors to the purchaser(s) of the Purchased Assets; and

    e)   approving the form of (i) notice (the "<u>Procedures Notice</u>") of the Auction and Sale (each, as defined below), attached hereto as <u>Exhibit D</u>, to be served on the Procedures Notice Parties (as defined below); and (ii) notice to be served on the counterparties to the Contracts and Leases potentially to be assumed and assigned in connection with the sale of the Purchased Assets, in the form attached hereto as <u>Exhibit E</u> (the "<u>Cure Notice</u>").

19.     The Debtors also request entry of an order:  (i) approving the sale of the Purchased Assets, free and clear of all liens, claims, encumbrances and other interests, except as provided in the Asset Purchase Agreement (as defined below) representing the Successful Bid (as defined below); (ii) authorizing the Debtors to consummate the Sale and execute and deliver all documents, agreements and contracts to be executed in conjunction therewith; and (iii)

granting related relief.

**<u>Assets To Be Sold</u>**

20.    As noted above, the Debtors seek to complete a sale (the "<u>Sale</u>") of the Purchased Assets, which comprise substantially all of the Debtors' assets, including among other things:

(1)    all Owned Real Property listed or referenced in <u>Section 2.1(a)</u> of the Disclosure Schedules;

(2)    subject to <u>Section 2.5</u> of the Stalking Horse APA, to the extent assignable pursuant to Section 365 of the Bankruptcy Code, the Sellers' leasehold interests in any Real and Personal Property items that are listed or referenced in <u>Section 2.1(b)</u> of the Disclosure Schedules;

(3)    all Accounts Receivable;

(4)    all Inventory;

(5)    all Equipment;

(6)    all prepaid expenses relating to the Business or any of the Purchased Assets;

(7)    subject to <u>Section 2.5</u> of the Stalking Horse APA, to the extent assignable pursuant to Section 365 of the Bankruptcy Code, all Assigned Contracts and Leases, together with all Purchased Deposits related to the Assigned Contracts and Leases listed or described on <u>Section 2.1(g)</u> of the Disclosure Schedules;

(8)    all Fixed Assets, including those described on <u>Section 2.1(h)</u> of the Disclosure Schedules;

(9)    all Intellectual Property used or held for use in the Business as currently conducted, including the Intellectual Property listed or described on <u>Section 2.1(i)</u> of the Disclosure Schedules;

(10)    all information technology assets, including, licenses, software, and hardware;

(11)    all ownership interests in those entities listed or described on <u>Section 2.1(k)</u> of the Disclosure Schedules to the extent assignable;

(12)    all Joint Venture Interests;

(13)    any and all Insurance Proceeds relating to the Business, except for refunds of any premiums paid, or other amounts due back to Sellers, with respect to cancelled policies, and except to the extent expressly excluded herein;

(14)    any causes of action, including those arising under chapter 5 of the Bankruptcy Code, of the Seller against those parties listed or described on Section 2.1(n) of the Disclosure Schedules;

(15)    all cash and cash equivalents in transit, in hand or in accounts, including security deposits relating to Assigned Contracts and bank accounts, other than the Wind-Down Reserve;

(16)    all goodwill associated with the Business or the Purchased Assets, other than any goodwill related solely to the Excluded Assets;

(17)    all personnel records or other records of the Affected Employee, other than those that are required by law to remain in Sellers' possession provided, however, that Sellers have the right to retain copies at Sellers' expense to the extent required by law;

(18)    all rights, claims or causes of action of Sellers against third parties relating to the Business arising out of events occurring prior to the Closing; and

(19)    all other assets (including intangible assets) of Sellers relating to the Business and not specifically included in the definition of Excluded Assets.

21.    The Purchased Assets shall <u>not</u> include the assets set forth in Section 2.2 of the

Stalking Horse Agreement (the "<u>Excluded Assets</u>"):

(1)    The Wind-Down Reserve;

(2)    all Seller's financial accounting books and records, income tax returns, minute books, stock ledgers, corporate seals and stock certificates of the Sellers and all shares of capital stock or other equity interests issued by Seller or securities convertible into, exchangeable or exercisable for any such shares of capital stock or other equity interests, except for those set forth on Section 2.1(k) of the Disclosure Schedules;

(3)    copies of any and all information not relating to the Business that is stored on Sellers' computer systems, data networks or servers;

(4)    any Contract and any Lease, in each case, that is not an Assigned Contract;

(5)    any Equipment or other personal or real property that a Seller possesses or occupies pursuant to a Contract or Lease that is not an Assigned Contract;

- 11 -

(6)      any causes of action arising under chapter 5 of the Bankruptcy Code other than those set forth in Section 2.1(n) or that are not Purchased Assets;

(7)      all Employee Plans and any assets of such plans;

(8)      any rights, claims or causes of action of the Sellers under this Agreement, the Purchase Price hereunder, and other agreements entered into in connection herewith;

(9)      any rights, deposits, refunds, rights of recovery, rights of set-off, rights of recoupment, claims or causes of action a Seller may have with respect to any Excluded Assets or any Excluded Liabilities;

(10)      all personnel records or other records of the Sellers that are required by law to remain in their possession, provided that complete and correct copies thereof related to Affected Employees are provided to Purchaser at Closing to the extent permitted by law;

(11)      all personnel records or other records of employees that are not Affected Employees;

(12)      all of Sellers' rights to receive refunds, payments or overpayments, clawbacks or other amounts (whether from a workers' compensation administrator or otherwise) in respect of any and all workers' compensation matters, claims, potential claims, purported claims and similar related items with respect to any employees that are not Affected Employees;

(13)      non-transferrable Permits;

(14)      all net operating losses of the Sellers and the Business, and any other Tax assets of the Sellers and the Business, as of or prior to the Closing Date;

(15)      all current and prior director and officer insurance policies of the Sellers and all rights of any nature with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries to the extent not used to pay any indebtedness of Sellers;

(16)      any asset of Sellers that otherwise would constitute a Purchased Asset but for the fact that it is sold or otherwise disposed of in the Ordinary Course of Business of a Seller and in conformity with the terms and conditions of this Agreement, during the time from the Signing Date until the Closing Date, or Purchaser otherwise agrees to such disposition;

(17)      all prepaid expenses relating to the Business or any of the Purchased Assets to the extent related to any Contract and any Lease, in each case, that is not an Assigned Contract; and

(18)    in the event the Owned Real Property and/or the Fort Wayne Plastics Assets are sold to purchasers other than the Purchaser (or any of its designees) in transactions for which the Purchaser has provided its prior written consent, such sold assets.

22.    The Debtors will entertain cash bids for the Purchased Assets.  Except as otherwise provided in the applicable Asset Purchase Agreement representing the Successful Bid, all of the Debtors' rights, title and interest in the Purchased Assets will be sold free and clear of any liens, security interests, claims, charges, encumbrances and other interests in accordance with section 363 of the Bankruptcy Code (collectively, the "Encumbrances").

23.    The Debtors propose that any Encumbrances shall attach to the purchase price payable to the Debtors' estates as the result of the Sale, net of any transaction fees and, if the Stalking Horse Purchaser is not the Successful Bidder (as defined below), after satisfaction of the DIP obligations, the Encina Obligations, and the obligations under the Second Lien Credit Agreement (the "Net Sale Proceeds"), in the same order of priority and subject to the rights, claims, defenses, and objections, if any, of all parties with respect thereto, subject to any further order of the Court.

## Summary of Proposed Bidding Procedures

24.    In order to ensure that the Debtors receive the maximum value for the Purchased Assets, the Stalking Horse Agreement is subject to higher or otherwise better offers, and, as such, the Stalking Horse Agreement will serve as the "stalking-horse" bid for the Purchased Assets.

**A.    Proposed Dates and Deadlines:**

| |
|---|
| Hearing on Bidding Procedures Order: June 6, 2017, subject to the convenience of the Court |
| Service of Bidding Procedures Order:  June 9, 2017 |

| |
|---|
| Service of Cure Notice: June 9, 2017 |
| Assumption/Assignment and Cure Objection Deadline: June 29, 2017 at 4:00 p.m. EDT |
| Sale Objection Deadline: June 29, 2017 at 4:00 p.m. EDT |
| Bid Deadline: June 30, 2017 at 5:00 p.m. EDT |
| Auction: July 6, 2017 at 10:00 a.m. CDT |
| Adequate Assurance Objection (In Event Stalking Horse Purchaser is not Successful Bidder: July 6, 2017 at 4:00 p.m. EDT |
| Sale Hearing: July 10, 2017, subject to the convenience of the Court |

**B.      Provisions Governing Qualifications of Bidders**

25.      Unless otherwise ordered by the Court, in order to participate in the bidding process, prior to the Bid Deadline, each person other than the Stalking Horse Purchaser, who wishes to participate in the bidding process (a "Potential Bidder") must deliver the following to the Bid Notice Parties (as defined below):

      a.  a written disclosure of the identity of each entity that will be bidding for the Purchased Assets or otherwise participating in connection with such bid; and

      b.  an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Sellers to a Potential Bidder) in form and substance satisfactory to the Debtors in their sole discretion.

26.      A Potential Bidder that delivers the documents and information described above or that the Debtors determine in their reasonable discretion, is likely (based on availability of financing, experience and other considerations) to be able to consummate the Sale, will be deemed a "Qualified Bidder."  As promptly as practicable after a Potential Bidder delivers all of the materials required above, the Debtors will determine and will notify the Potential Bidder if such Potential Bidder is a Qualified Bidder.

### C.    Due Diligence

27.    The Debtors will provide any Potential Bidder such due diligence access or additional information as the Debtors, in their reasonable discretion, deem appropriate, which may include differentiations between the diligence provided to strategic and financial bidders, as appropriate, and contractual obligations to limit access to certain proprietary information; provided, however, that with respect to any strategic bidders, the Debtors may make reasonable commercial efforts to provide such strategic bidders with the same information provided to the Stalking Horse Purchaser; provided further that any information provided to any strategic or financial bidder that previously had not been provided to the Stalking Horse Purchaser shall be provided to the Stalking Horse Purchaser contemporaneously with being provided to such other bidder.  The due diligence period will extend to the commencement of the Auction.  Additional due diligence will not be provided after the commencement of the Auction, unless otherwise deemed reasonably appropriate by the Debtors after consultation with the Committee and Encina Business Credit SPV, LLC in its capacity as first lien agent relating to the Encina Obligations ("Encina").

### D.    Provisions Governing Qualified Bids

28.    To be eligible to participate in the Auction (as defined below), each offer, solicitation, or proposal (each, a "Bid"), must be submitted by a Qualified Bidder and must satisfy each of the conditions set forth below (each a "Qualified Bid"), as determined by the Debtors, in their reasonable discretion, after consultation with the Committee and Encina:

> a.    it states that the applicable Qualified Bidder offers to purchase, in cash or, if applicable, through a credit bid, or any combination of the two, some or all of the Purchased Assets upon the terms and conditions that the Debtors, in consultation with the Committee and Encina, reasonably determine are no less favorable to the Debtors than those set forth in the Stalking Horse Agreement; provided, however, the sale of the Fort Wayne Plastics Assets may be sold to

purchasers other than the Stalking Horse Purchaser in a transaction to which the Stalking Horse Purchaser has provided its prior written consent;

b.  it offers to purchase all or substantially all of the Purchased Assets or only a portion of the Purchased Assets; provided, however, that a Bid that offers to purchase only a portion of the Purchased Assets may only be a Qualified Bid to the extent that the value of such Bid, in combination with the value of other Bids for other Purchased Assets, exceeds the Minimum Initial Overbid Amount (as defined below) applicable to Qualified Bids for all or substantially all the Purchased Assets.  The Debtors, in consultation with the Committee and Encina, may waive or modify the application of the Qualified Bid conditions in respect of Bids for a portion of the Purchased Assets, including, *inter alia,* the amount of the Good Faith Deposit (as defined below);

c.  it includes a signed writing stating that the Qualified Bidder's offer is irrevocable until the selection of the Successful Bidder, provided that if such bidder is selected as the Successful Bidder or the Back-Up Bidder (each, as defined below) its offer shall remain irrevocable until the later of (i) the closing of the Sale to the Successful Bidder or the Back-Up Bidder, and (ii) the date that is thirty (30) days after the Sale Hearing;

d.  it includes confirmation that there are no conditions precedent to the Qualified Bidder's ability to enter into a definitive agreement and that all necessary internal and shareholder approvals have been obtained prior to the submission of the Bid;

e.  it includes a duly authorized and executed copy of an asset purchase agreement, including the purchase price for the Purchased Assets expressed in U.S. Dollars (the "Purchase Price"), together with all exhibits and schedules thereto, together with copies marked to show any amendments and modifications to the Stalking Horse Agreement (an "Asset Purchase Agreement") and the proposed order for approval of the Sale by the Bankruptcy Court;

f.  it includes financial statements or other written evidence, including (if applicable) a firm, irrevocable commitment for financing, establishing the ability of the Qualified Bidder to consummate the proposed Sale and pay the Purchase Price in cash, such as will allow the Debtors to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Asset Purchase Agreement;

g.  it has a value to the Debtors, determined in the Debtors' reasonable business judgment, after consultation with the Committee and Encina, that is greater than or equal to the sum of the value offered under the Stalking Horse Agreement, plus (i) the aggregate amount of the Break-Up Fee and Expense

Reimbursement, plus (ii) $1,000,000 (the "<u>Minimum Initial Overbid Amount</u>");

h. it identifies with particularity which Contracts and Leases the Qualified Bidder wishes to assume and provides details of the Qualified Bidder's proposal for the treatment of related cure costs and the provision of adequate assurance of future performance to the counterparties to such Contracts and Leases;

i. it includes an acknowledgement and representation that the Qualified Bidder: (i) has had an opportunity to conduct any and all required due diligence regarding the Purchased Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Purchased Assets in making its bid; (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Purchased Assets or the completeness of any information provided in connection therewith or with the Auction, except as expressly stated in the Asset Purchase Agreement; and (iv) is not entitled to any expense reimbursement, break-up fee, or similar type of payment in connection with its bid;

j. it includes evidence, in form and substance reasonably satisfactory to the Debtors, of authorization and approval from the Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Asset Purchase Agreement;

k. it is accompanied by a good faith deposit (the "<u>Good Faith Deposit</u>") in the form of a wire transfer (to a bank account specified by the Debtors), certified check or such other form acceptable to the Debtors, payable to the order of the Debtors (or such other party as the Debtors may determine) in an amount equal to 5% of the Purchase Price;

l. it contains a reasonable description of how the Qualified Bidder intends to treat current employees of the Sellers;

m. it contains such other information as may be reasonably requested by the Debtors, and

n. it is received prior to the Bid Deadline.

29.    The Stalking Horse Purchaser will be deemed a Qualified Bidder without compliance with any of the foregoing requirements, and, correspondingly, the Stalking Horse Agreement will be deemed, without more, a Qualified Bid, for all purposes in connection with the bidding process, the Auction, and the Sale.

- 17 -

30.    The Debtors shall notify the Stalking Horse Purchaser, the DIP Lender, Encina and all Qualified Bidders in writing as to whether or not any bids (other than the Stalking Horse Agreement) constitute Qualified Bids and identify any such bid(s) promptly after making such determination; provided, however, that such notification shall not be given later than one (1) business day following the Bid Deadline; provided further that the Debtors shall provide copies of all Qualified Bids no later than one (1) business day following receipt by the Debtors.

**E.    Bid Deadline**

31.    A Qualified Bidder that desires to make a bid will deliver written copies of its bid via email to the proposed investment banker to the Debtors, Lincoln International, 633 West Fifth Street, Suite 6650, Los Angeles, CA 90071 (Attn: Alexander Stevenson, astevenson@lincolninternational.com), with a copy to proposed counsel for the Debtors, DLA Piper LLP (US), 444 West Lake Street, Suite 900, Chicago, Illinois 60606 (Attn: John Lyons, Esq., john.lyons@dlapiper.com, and Daniel Simon, Esq., daniel.simon@dlapiper.com) and DLA Piper LLP (US), 1201 North Market Street, Suite 2100, Wilmington, Delaware 19801 (Attn: Stuart Brown Esq., stuart.brown@dlapiper.com) (collectively, the "Bid Notice Parties") so as to be received by the foregoing parties no later than 5:00 p.m. (EDT) on June 30, 2017 (the "Bid Deadline").  The Bid Deadline may be extended by the Debtors in consultation with the Committee and Encina.

**F.    Credit Bidding**

32.    In connection with the Sale of the Purchased Assets, parties, which hold perfected liens in the Purchased Assets, may seek to submit credit bids for such Purchased Assets.  For this reason, the Debtors request that the Court (i) authorize credit bidding in connection with the Sale to the fullest extent permitted by Bankruptcy Code section 363(k); and (ii) for purposes of valuing credit bids, deem (A) the full face amount of a credit bid to have the

- 18 -

same value as the equivalent amount of cash; and (B) the amount of any funding for administrative expenses and other wind down expense claims of the Debtors (a "<u>Wind Down Contribution</u>") to be part of the Purchase Price ascribed to such credit bid.

### G.   Evaluation of Competing Bids

33.     A Qualified Bid will be valued based upon several factors including, without limitation, (1) the amount of the Purchase Price provided by such bid, (2) the risks and timing associated with consummating such bid, (3) any proposed revisions to the Stalking Horse Agreement and the Proposed Sale Order, (4) the amount of any Wind Down Contribution made by such bid, if applicable, (5) the ability of the Qualified Bidder to obtain appropriate regulatory approvals, and (6) any other factors deemed relevant by the Debtors, in consultation with the Committee and Encina.  For purposes of such valuation, the full face amount of a credit bid shall be deemed to have the same value as the equivalent amount of cash.  The Debtors shall treat comparable credit bids and cash bids as equivalent and no credit bid shall be considered inferior to a comparable cash bid because it is a credit bid.

### H.   No Qualified Bids

34.     If the Debtors do not receive any Qualified Bids other than the Stalking Horse Agreement, the Debtors will not hold an auction and the Stalking Horse Purchaser will be named the Successful Bidder upon the Bid Deadline.

### I.   Auction Process

35.     If the Debtors receive one or more Qualified Bids in addition to the Stalking Horse Agreement, the Debtors will conduct an auction of the Purchased Assets (the "<u>Auction</u>"), which shall take place at <u>10:00 a.m. (CDT) on July 6, 2017</u>, at the offices of DLA Piper LLP (US), 444 W. Lake St., Suite 900, Chicago, Illinois 60606, or such other location as shall be

timely communicated to all entities entitled to attend the Auction.  The Auction, which shall be

recorded and transcribed, shall be conducted in accordance with the following procedures:

a.   only the Stalking Horse Purchaser and such other Qualified Bidders who have timely submitted Qualified Bids will be entitled to make any subsequent bids at the Auction;

b.   the Stalking Horse Bidder will, notwithstanding the elements of the Stalking Horse Purchase Price, be entitled to make subsequent bids for all or substantially all or any combination of the Purchased Assets comprising further credit bids, cash, additional or different consideration of any type, or any combination of the foregoing;

c.   each Qualified Bidder shall be required to confirm that it has not engaged in any collusion, within the meaning of section 363(n) of the Bankruptcy Code with respect to any Bids submitted or not submitted in connection with the Sale;

d.   at least one (1) business day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Debtors whether it intends to attend the Auction <u>and</u> all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder in attendance at the Auction in person; <u>provided</u> that in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until the selection of the Successful Bidder and Back-Up Bidder at the conclusion of the Auction.  At least one (1) business day prior to the Auction, the Debtors will provide copies of the Qualified Bid, or combination of Qualified Bids, which the Debtors believe, after consultation with the Committee and Encina, is the highest or otherwise best offer for the Purchased Assets (the "<u>Starting Bid</u>") to the Stalking Horse Purchaser, the DIP Lender, the Committee and all other Qualified Bidders who have timely submitted Qualified Bids;

e.   all Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction and the actual identity of each Qualified Bidder will be disclosed on the record at the Auction;

f.   the Debtors, after consultation with the Committee and Encina, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances for conducting the Auction, <u>provided</u> that such rules (i) are not inconsistent with the Bidding Procedures, the Bankruptcy Code, or any order of the Court entered in connection herewith; and (ii) are disclosed to each Qualified Bidder attending the Auction;

g.  bidding at the Auction will begin with the Starting Bid and continue in bidding increments (each, a "Subsequent Bid") providing a net value to the Debtors' estates of at least $250,000 above the prior bid.  After the first round of bidding and between each subsequent round of bidding, the Debtors, after consultation with the Committee and Encina, shall announce the bid (and the value of such bid) that they believe to be the highest or otherwise best bid (each, the "Leading Bid");

h.  a round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid;

i.  except as specifically set forth herein, for the purpose of evaluating the value of the Purchase Price provided by each Subsequent Bid (including any Subsequent Bid by the Stalking Horse Purchaser), the Debtors will give effect to the Stalking Horse Protections as well as any additional liabilities to be assumed by a Qualified Bidder and any additional costs which may be imposed on the Debtors; and

j.  the Debtors may accept bids for any portion of the Purchased Assets, as well as bids for substantially all of the Purchased Assets; provided, however, that such a Qualified Bid that offers to purchase only a portion of the Purchased Assets may only be part of the Successful Bid to the extent that the value of such Qualified Bid, in combination with the value of other Qualified Bids for other Purchased Assets, exceeds the value of any then-pending Leading Bid for all or substantially all the Purchased Assets.

**J.    Selection of Successful Bid and Back-Up Bid**

a.  Prior to the conclusion of the Auction, the Debtors, in consultation with the Committee and Encina, will review and evaluate each Qualified Bid submitted at the Auction (including by the Stalking Horse Purchaser) in accordance with the procedures approved by the Court and determine which offer is the highest or otherwise best offer (one or more such bids, collectively the "Successful Bid" and the bidder(s) making such bid(s), collectively, the "Successful Bidder"), and communicate to the Stalking Horse Purchaser and the other Auction participants the identity of the Successful Bidder and the details of the Successful Bid.  The determination of the Successful Bid by the Debtors at the conclusion of the Auction shall be final, subject only to approval by the Bankruptcy Court.

b.  Other than the Stalking Horse Purchaser, the Qualified Bidder(s) with the next highest or otherwise best Qualified Bid, as determined by the Debtors in consultation with the Committee and Encina, will be required to serve as a back-up bidder (the "Back-Up Bidder") and keep its bid open and irrevocable until the later to occur of thirty (30) days after the Sale Hearing and the closing on the Successful Bid with the Successful Bidder.  If the Successful

Bidder fails to consummate the Sale, the Back-Up Bidder will be deemed to be the new Successful Bidder, and the Debtors will be authorized, but not required, to consummate the Sale with the Back-Up Bidder without further order of the Bankruptcy Court.  In no event shall the Stalking Horse Purchaser be the Back-Up Bidder.

c.   Within two (2) business days after conclusion of the Auction, the Successful Bidder shall complete and execute all agreements, contracts, instruments and other documents necessary to consummate the Successful Bid.  Within one (1) business day after conclusion of the Auction, but in no event prior to the commencement of the Sale Hearing, the Debtors shall file a notice with the Bankruptcy Court identifying the Successful Bidder and the Back-Up Bidder.

d.   The Debtors will sell the Purchased Assets to the Successful Bidder pursuant to the terms of the Successful Bid upon the approval of such Successful Bid by the Bankruptcy Court at the Sale Hearing.

**K.     Return of Deposits**

a.   All Good Faith Deposits shall be returned to each bidder not selected by the Debtors as the Successful Bidder or the Back-Up Bidder no later than five (5) business days following the conclusion of the Auction.

**L.     The Stalking Horse Protections**

a.   In recognition of the expenditure of time, energy, and resources, the Debtors have agreed that if the Stalking Horse Purchaser is not the Successful Bidder, the Debtors will pay the Stalking Horse Purchaser from the Sale proceeds (i) the Break-Up Fee; and (ii) the Expense Reimbursement.  The Stalking Horse Purchaser shall provide reasonable documentation to the Debtors of the expenses for which it seeks reimbursement.  The Break-Up Fee and Expense Reimbursement shall be payable as provided for pursuant to the terms of the Stalking Horse Agreement.

b.   The Debtors have agreed that their obligation to pay the Stalking Horse Protections pursuant to the Stalking Horse Agreement shall survive termination of the Stalking Horse Agreement, and, to the extent owed by the Debtors, constitute an administrative expense claim under section 503(b) of the Bankruptcy Code against each Debtor and, notwithstanding section 507(a) of the Bankruptcy Code, shall be payable in accordance with the terms and conditions of the Stalking Horse Agreement and the Bidding Procedures Order.

**M.     Sale Hearing**

a.   The Debtors will seek entry of an order from the Bankruptcy Court at a hearing (the "Sale Hearing") to begin on or before July 10, 2017 (prevailing Eastern Time), subject to the availability of the Bankruptcy Court, to approve

- 22 -

and authorize the Sale, and assumption and assignment of designated Contracts and Leases, to the Successful Bidder on the terms and conditions memorialized in the Successful Bidder's Asset Purchase Agreement and proposed sale order.

## **Notice of Sale Hearing**

36.     As stated above, the Debtors request that this Court schedule the Sale Hearing for July 10, 2017.  The Debtors propose that any objections to the Sale be filed by 4:00 p.m. (prevailing Eastern Time) on June 29, 2017.

37.     The Debtors also request that the Court approve the form of the Procedures Notice, substantially in the form of <u>Exhibit D</u> hereto.  The Debtors will serve a copy of the Procedures Notice on the following parties:  (a) the U.S. Trustee, (b) the Committee, (c) any parties requesting notices in these cases pursuant to Bankruptcy Rule 2002, (d) all known creditors of the Debtors, (e) counsel to the Stalking Horse Purchaser, (f) counsel to the DIP Lender, (g) counsel to the Prepetition Lenders, and (i) all known Potential Bidders (collectively with the parties specified in this paragraph, the "<u>Procedures Notice Parties</u>").

38.     The Debtors propose to serve the Procedures Notice within three (3) business days following entry of the Bidding Procedures Order, by first-class mail, postage prepaid on the Procedures Notice Parties.  The Procedures Notice provides that any party that has not received a copy of the Motion or the Bidding Procedures Order that wishes to obtain a copy of the Motion or the Bidding Procedures Order, including all exhibits thereto, may make such a request in writing to JND Corporate Restructuring, by calling the following toll-free number: (855) 812-6112, or by visiting www.jndla.com/cases/katyindustries.

39.     The Debtors submit that the foregoing notice procedures comply fully with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the Bidding Procedures, the Auction, the Sale Hearing and the Sale to the Debtors' creditors and

other parties in interests as well as to those who have expressed an interest or are likely to express an interest in bidding for the Purchased Assets.  Based on the foregoing, the Debtors respectfully request that this Court approve these proposed notice procedures.

## Sale Hearing

40.     At the Sale Hearing, the Debtors will seek approval of (i) the sale of the Purchased Assets to the Successful Bidder, free and clear of all Encumbrances pursuant to section 363 of the Bankruptcy Code, with all Encumbrances to attach to the Net Sale Proceeds (if the Stalking Horse Purchaser is the Successful Bidder), or to all proceeds of the Sale arising from any other Successful Bidder's Asset Purchase Agreement) with the same extent and validity and in the same order of priority as they attached to the Purchased Assets prior to the Sale; and (ii) the assumption by the Debtors and assignment to the Successful Bidder of the assumed Contracts and Leases pursuant to section 365 of the Bankruptcy Code.  The Debtors will submit and present additional evidence, as necessary, at the Sale Hearing demonstrating that the Sale is fair, reasonable and in the best interest of the Debtors' estates and all interested parties.

## Procedures for the Assumption and Assignment of Assumed Contracts and Leases

41.     As noted above, the Debtors will seek to assume and assign certain Contracts and Leases to be identified on the schedules to the Stalking Horse Agreement, as such schedules may be modified or supplemented by the Successful Bidder's Asset Purchase Agreement to exclude Contracts and Leases included, or include Contracts or Leases that were excluded from the Stalking Horse Agreement's schedules (collectively, with respect to the schedules attached to the Successful Bid, the "Assumed Executory Contracts").

42.     At least initially, the Assumed Executory Contracts will be those Contracts and Leases that the Debtors, in consultation with the Stalking Horse Purchaser, believe may be

assumed and assigned as part of the orderly transfer of the Purchased Assets.  The Successful Bidder, whether the Stalking Horse Purchaser or another Qualified Bidder, may choose to exclude (or to add) Contracts or Leases to the list of the Assumed Executory Contracts at any time prior to the closing of the Sale.

43.     In the interim, the Debtors will serve, by first-class mail, postage prepaid, the Motion and the Cure Notice, substantially in the form of <u>Exhibit E</u> hereto, upon each counterparty to the Assumed Executory Contracts by no later than five business (5) days following entry of the Bidding Procedures Order.  The Cure Notice will state the date, time and place of the Sale Hearing as well as the date by which any objection to the assumption and assignment of the Assumed Executory Contracts must be filed and served.  The Cure Notice also will identify the amounts, if any, that the Debtors believe are owed to each counterparty to the Assumed Executory Contracts in order to cure any monetary defaults that exist thereunder (the "<u>Cure Amounts</u>").

44.     Unless the Assumed Executory Contract counterparty properly files and serves an objection to the Cure Amount contained in the Cure Notice or to adequate assurance of future performance by the Successful Bidder, and such Contract or Lease is assumed and assigned pursuant to order of this Court, the Assumed Executory Contract counterparty will receive at the time of the closing of the Sale (or as soon as reasonably practicable thereafter), the Cure Amount set forth in the Cure Notice, if any, with payment to be made pursuant to the terms of the Successful Bidder's Asset Purchase Agreement.  An Assumed Executory Contract counterparty is encouraged to contact Debtors' counsel, DLA Piper LLP (US), prior to the deadline to file and serve an objection to the Cure Amount in an attempt to reach consensus on

the Cure Amount based upon reasonable and supportable documentation provided by such counterparty.

45.      If an objection is filed by a counterparty to an Assumed Executory Contract (each, an "Assumed Executory Contract Objection"), the Debtors propose that such objection must set forth a specific default in the Assumed Executory Contract and claim a specific monetary amount that differs from the amount, if any, specified by the Debtors in the Cure Notice.  To the extent there are any additional Contracts or Leases to be assumed pursuant to the Successful Bidder's Asset Purchase Agreement, this Motion constitutes a separate motion to assume and assign all such additional Contracts or Leases to the Successful Bidder pursuant to section 365 of the Bankruptcy Code; each such Contract or Lease will be listed on an exhibit to the Successful Bidder's Asset Purchase Agreement, and the relevant counterparty will be given a Cure Notice (each, a "Supplemental Cure Notice").

46.      If any counterparty files an Assumed Executory Contract Objection to the assumption and assignment of its Assumed Executory Contract, the Debtors propose that the counterparty must file the objection by no later than (i) 4:00 p.m. (prevailing Eastern Time) on June 29, 2017 or (ii) the date otherwise specified in the Cure Notice or the Supplemental Cure Notice, as applicable.  Any Assumed Executory Contract Objection must state whether the counterparty objects to the Cure Amount (each, a "Cure Objection") and/or the Successful Bidder's ability to provide adequate assurance of future performance under the Assumed Executory Contract (each, an "Adequate Assurance Objection").  With respect to any Assumed Executory Contract listed in a Supplemental Cure Notice, the Debtors propose that the deadline to file an Assumed Executory Contract Objection shall be fourteen (14) days after the service of such Supplemental Cure Notice on the relevant counterparty.

47.     After receipt of a Cure Objection (either formal or informal), the Debtors will attempt to reconcile any differences in the Cure Amounts proposed by the Debtors and sought by the counterparty.  In the event that the Debtors and the non-debtor counterparty cannot resolve a Cure Objection, and the Court does not otherwise make a determination at the Sale Hearing, the Debtors may, in consultation with the Successful Bidder, segregate any disputed Cure Amounts pending the resolution of any such dispute by the Court or mutual agreement of the parties.  Cure Amounts disputed by any counterparty will be resolved by the Court at the Sale Hearing or such later date as may be agreed to or otherwise ordered by the Court.

48.     The Debtors shall work with the Successful Bidder to address any Adequate Assurance Objections and satisfy any requirements regarding adequate assurance of future performance under section 365(b) of the Bankruptcy Code in connection with the proposed assignment of any Assumed Executory Contract, and the failure to provide adequate assurance of future performance to any counterparty to an Assumed Executory Contract shall not excuse the Successful Bidder from performance of any and all of its obligations pursuant to the Successful Bidder's Asset Purchase Agreement.  The Debtors propose that the Court rule on any outstanding Adequate Assurance Objections at the Sale Hearing.

49.     Except to the extent otherwise provided in the Successful Bidder's Asset Purchase Agreement or the Sale Order, the Debtors and the Debtors' estates shall be relieved of all liability accruing or arising under the Assumed Executory Contracts after the assumption and assignment thereof pursuant to section 365(k) of the Bankruptcy Code.

- 27 -

## APPLICABLE AUTHORITY

**A.**     **The Sale of the Purchased Assets is Authorized by Section 363 as a Sound Exercise of the Debtors' Business Judgment**

50.     In accordance with Bankruptcy Rule 6004, sales of estate assets outside the ordinary course of business may be by private sale or public auction.  The Debtors have determined that the Sale of the Purchased Assets by public auction will enable it to obtain the highest or otherwise best offer for these assets (thereby maximizing the value to the estates) and is in the best interests of the Debtors' creditors.  In particular, the Stalking Horse Agreement is the result of comprehensive, arms' length negotiations for the Sale of the Purchased Assets, and the Sale pursuant to the terms of the Stalking Horse Agreement, subject to higher or otherwise better offers at the Auction, will provide a greater recovery for the Debtors' creditors than would be provided by any other alternative under the circumstances.

51.     Section 363 of the Bankruptcy Code provides that a trustee, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).  Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, a sale of a debtor's assets should be authorized if a sound business purpose exists for doing so.  See, e.g., Meyers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); In re Titusville Country Club, 128 B.R. 396, 399 (W.D. Pa. 1991); In re Delaware & Hudson Ry. Co., 124 BR. 169, 176 D. Del. 1991); see also Official Committee of Unsecured Creditors v. LTV Corp. (In re Chateaugay Corp.), 973 F.2d 141, 143 (2d Cir. 1992); Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983); Committee of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

- 28 -

52.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  See, e.g., In re Food Barn Stores, Inc., 107 F.3d 558, 564-65 (8th Cir. 1997) (finding that in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); In re Integrated Resources, Inc., 147 B.R. 650, 659 (Bankr. S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the . . . [trustee's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting In re Atlanta Packaging Prods., Inc., 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)).  "As long as the sale appears to enhance a debtor's estate, court approval of a Trustee's decision to sell should only be withheld if the Trustee's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code.  GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd., 331 B.R. 251, 255 (N.D. Tex. 2005) (internal citations omitted).

53.     Applying section 363, the proposed Sale of the Purchased Assets should be approved.  As set forth above, the Debtors have determined that the best method of maximizing the recovery of the Debtors' creditors would be through the Sale of the Purchased Assets.  In order to ensure a fair auction process, the Debtors and their advisors have and will continue to solicit interest from numerous potential purchasers.

54.     Further, the Debtors believe that the value the Debtors' estates—and, thus, the Debtors' creditors—will receive for the Sale of the Purchased Assets as a going concern exceeds any value the Debtors' estates could get for the Purchased Assets if the Debtors were required to liquidate their assets piecemeal.  The Debtors also believe that the value of the consideration likely to be received for the Purchased Assets under an Asset Purchase Agreement is fair and reasonable (as it will have to be higher than the Stalking Horse Purchase Price).  As further assurance of value, however, bids will be tested through the Auction

consistent with the requirements of the Bankruptcy Code, the Bankruptcy Rules, and pursuant to the Bidding Procedures approved by the Court.   Consequently, the fairness and reasonableness of the consideration to be paid by the Successful Bidder ultimately will be demonstrated by adequate "market exposure" and an open and fair auction process — the best means, under the circumstances, for establishing whether a fair and reasonable price is being paid.

55.     The Debtors and their advisors believe that the timeline for the marketing and sale of the Purchased Assets is adequate, and balances the need to fully market the Purchased Assets and maintain continuity in the operation of the business for vendors, customers and employees in light of the Debtors' liquidity constraints.   There is a limited universe of potential acquirers of the Purchased Assets and, upon the execution of an appropriate confidentiality agreement, the Debtors' investment banker is prepared to quickly contact potential interested parties and determine the level of interest in a potential acquisition and provide them access to a confidential business overview and management presentation and access to a data room that has been assembled.

**B.     The Bidding Procedures Are Appropriate and Will Maximize the Value Received for the Purchased Assets.**

56.     As noted above, the paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.   To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and, therefore, are appropriate in the context of bankruptcy sales.   See, e.g., In re Financial News Network, Inc., 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("Court-imposed rules for the disposition of assets . . . [should] provide an

adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

57.    Procedures to dispose of assets, similar to the proposed Bidding Procedures, have been approved in other large, complex bankruptcy cases in this District.  See, e.g., In re Endeavour Operating Corp., No. 14-12308 (KJC) (Bankr. D. Del. May 20, 2015) [D.I. 668]; In re Old FOH Inc. (f/k/a/ Frederick's of Hollywood, Inc.), No. 15-10836 (KG) (May 6, 2015) [D.I. 120]; In re RS Legacy Corp. (f/k/a RadioShack Corp.), No. 15-10197 (BLS) (Bankr. D. Del. Feb. 20, 2015) [D.I. 457]; In re Orchard Supply Hardware Stores Corporation, Case No. 13-11565 (CSS) (Bankr. D. Del. July 8, 2013) [D.I. 155].

58.    The Debtors believe that the Bidding Procedures will establish the parameters under which the value of the Purchased Assets may be tested at an auction and through the ensuing Sale Hearing.  Such procedures will increase the likelihood that the Debtors' creditors will receive the greatest possible consideration for their assets because they will ensure a competitive and fair bidding process.  They also allow the Debtors to undertake an auction in as expeditious and efficient manner as possible, which the Debtors believe is essential to maximizing the value of the Debtors' estates for their creditors.

59.    The Debtors also believe that the proposed Bidding Procedures will promote active bidding from seriously interested parties and will dispel any doubt as to the best and highest offer reasonably available for the Debtors' assets.  In particular, the proposed Bidding Procedures will allow the Debtors to conduct an auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction.

60.     In sum, the Debtors believe that the Bidding Procedures will encourage bidding for the Purchased Assets and are consistent with the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings.    Accordingly, the proposed Bidding Procedures are reasonable, appropriate and within the Debtors' sound business judgment.

## C.    Credit Bidding Should be Authorized

61.     A secured creditor is permitted to "credit bid" the amount of its allowed secured claim in a sale under Section 363 of the Bankruptcy Code.    Section 363(k) of the Bankruptcy Code provides, in relevant part, that, unless the court for cause orders otherwise, the holder of an allowed claim secured by property that is the subject of the sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property."    11 U.S.C. § 363(k).    Even if a secured creditor is undersecured, as determined in accordance with section 506(a) of the Bankruptcy Code, section 363(k) allows such creditor to bid the full face value of its claim for its collateral and does not limit the credit bid to the claim's secured portion.    See Cohen v. KB Mezzanine Fund II, LP (In re Submicron Sys. Corp.), 432 F.3d 448, 459-60 (3d Cir. 2006) (explaining that "[i]t is well settled among district and bankruptcy courts that creditors can bid the full face value of their secured claims under § 363(k)").

62.     Pursuant to the Bidding Procedures, the Debtors' secured lenders, including the Second Lien Lender, is entitled to credit bid some or all of their claims for their respective collateral pursuant to section 363(k) of the Bankruptcy Code.    Because the Second Lien Lender holds claims that are secured by certain of the Purchased Assets, the Second Lien Lender (or Stalking Horse Purchaser as its assignee or designee), should be allowed to credit bid the face value of its secured claims, either directly or through a direction to the Second Lien Agent, in

- 32 -

order to purchase such assets and to have such credit bids be deemed to have the same value as the equivalent amount of cash.

### D. The Sale of the Purchased Assets Free and Clear of Encumbrances is Authorized by Section 363(f)

63.     The Debtors further submit that it is appropriate to sell the Purchased Assets free and clear of Liens and other Encumbrances pursuant to section 363(f) of the Bankruptcy Code, with any such Liens and other Encumbrances attaching to the Net Sale Proceeds of the Purchased Assets.  Section 363(f) of the Bankruptcy Code authorizes a trustee to sell assets free and clear of Encumbrances if:

(1)     applicable nonbankruptcy law permits sale of such property free and clear of such interests;

(2)     such entity consents;

(3)     such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

(4)     such interest is in bona fide dispute; or

(5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.  11 U.S.C. § 363(f).

64.     This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

65.     Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Purchased Assets "free and clear" of Encumbrances.  In re Dundee Equity Corp., 1992 WL 53743, at *4 (Bankr. S.D.N.Y. March 6, 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); In re Bygaph, Inc., 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same); Michigan Employment

Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.), 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code section 363(f) is written in the disjunctive; holding that the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code section 363(f) is met).

66.     The Debtors believe that one or more of the tests of section 363(f) are satisfied with respect to the Sale of the Purchased Assets pursuant to the Stalking Horse Agreement.  In particular, the Debtors believe that Encina and the First Lien Lenders will consent to the sale free and clear under section 363(f)(2).  Where that may not be the case, a sale free and clear can proceed pursuant to section 363(f)(5) of the Bankruptcy Code because the relevant Encumbrances will attach to the proceeds of the sale and the Debtors will establish at the Sale Hearing that the relevant creditors can be compelled to accept a monetary satisfaction of their respective claims.  Accordingly, section 363(f) authorizes the Sale of the Purchased Assets free and clear of any Encumbrances.

67.     Although section 363(f) of the Bankruptcy Code provides for the sale of assets "free and clear of any interests," the term "any interests" is not defined anywhere in the Bankruptcy Code.  Folger Adam Security v. DeMatteis/MacGregor JV, 209 F.3d 252, 257 (3d Cir. 2000).  In the case of In re Trans World Airlines, Inc.,  322 F.3d 283, 288-89 (3d Cir. 2003), the Third Circuit specifically addressed the scope of the term "any interests."  The Third Circuit observed that while some courts have "narrowly interpreted that phrase to mean only in rem interests in property," the trend in modern cases is toward "a more expansive reading of 'interests in property' which 'encompasses other obligations that may flow from ownership of the property.'"  Id. at 289 (citing 3 Collier on Bankruptcy 15th Ed. Rev., ¶ 363.06[1] (L. King, 15th rev. ed. 1988)).  As determined by the Fourth Circuit in In re Leckie Smokeless Coal Co.,

99 F.3d 573, 581-582 (4th Cir. 1996), a case cited with approval and extensively by the Third

Circuit in <u>Folger</u>, <u>supra</u>, the scope of section 363(f) is not limited to *in rem* interests.  Thus, the

Third Circuit in <u>Folger</u> stated that <u>Leckie</u> held that the debtors "could sell their assets under

§ 363(f) free and clear of successor liability that otherwise would have arisen under federal

statute." <u>Folger</u>, 209 F.3d at 258.

68.    Courts have consistently held that a buyer of a debtor's assets pursuant to a

section 363 sale may take such assets free from successor liability resulting from pre-existing

claims.  <u>See</u> <u>The Ninth Avenue Remedial Group v. Allis-Chalmers Corp.</u>, 195 B.R. 716, 732

(Bankr. N.D. Ind. 1996) (stating that a bankruptcy court has the power to sell assets free and

clear of any interest that could be brought against the bankruptcy estate during the bankruptcy);

<u>MacArthur Company v. Johns-Manville Corp. (In re Johns-Manville Corp.)</u>, 837 F.2d 89, 93-94

(2d Cir. 1988) (channeling of claims to proceeds consistent with intent of sale free and clear

under section 363(f) of the Bankruptcy Code); <u>In re New England Fish Co.</u>, 19 B.R. 323, 329

(Bankr. W.D. Wash. 1982) (transfer of property in free and clear sale included free and clear of

Title VII employment discrimination and civil rights claims of debtor's employees); <u>In re</u>

<u>Hoffman</u>, 53 B.R. 874, 876 (Bankr. D.R.I. 1985) (transfer of liquor license free and clear of any

interest permissible even though the estate had unpaid taxes); <u>American Living Systems v.</u>

<u>Bonapfel (In re All Am. Of Ashburn, Inc.)</u>, 56 B.R. 186, 190 (Bankr. N.D. Ga. 1986) (product

liability claims precluded on successor doctrine in a sale of assets free and clear); <u>WBO</u>

<u>Partnership v. Virginia Dept. of Medical Assistance Servs. (In re WBO Partnership)</u>, 189 B.R.

97, 104-05 (Bankr. E.D. Va. 1995) (Commonwealth of Virginia's right to recapture

depreciation is an "interest" as used in section 363(f)).[4]  The purpose of an order purporting to

---

4    Some courts, concluding that section 363(f) of the Bankruptcy Code does not empower them to convey assets
     free and clear of claims, have nevertheless found that section 105(a) of the Bankruptcy Code provides such

authorize the transfer of assets free and clear of all "interests" would be frustrated if claimants could thereafter use the transfer as a basis to assert claims against the purchaser arising from the Debtors' pre-sale conduct.  Under section 363(f) of the Bankruptcy Code, the purchaser is entitled to know that the Debtors' assets are not infected with latent claims that will be asserted against the purchaser after the proposed transaction is completed.  Accordingly, consistent with the above-cited case law, the Debtors request that the order approving the Sale state that the Successful Bidder is not liable as a successor under any theory of successor liability, for claims that encumber or relate to the Purchased Assets.

**E.     The Proposed Notice of Bidding Procedures and Auction Is Appropriate**

69.     The Debtors believe that they will obtain the maximum recovery for their creditors if the Purchased Assets are sold in accordance with the proposed Bidding Procedures. The Debtors have already taken significant steps to identify potential purchasers, but intend to provide all potentially interested parties with as much notice as possible.

70.     Under Bankruptcy Rules 2002(a) and (c), the Debtors are required to notify creditors of the proposed sale of the Debtors' assets, including a disclosure of the time and place of an auction, the terms and conditions of a sale, and the deadline for filing any objections.  The Debtors submit that the Notice Procedures comply fully with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the sale by auction to the Debtors' creditors and other interested parties, as well as to those parties who have expressed an interest, or may express an interest, in bidding for the Purchased Assets.  The proposed time

---

authority.   See, e.g., Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.), 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) (stating that the absence of specific authority to sell assets free and clear of claims poses no impediment to such a sale, as such authority is implicit in the court's equitable powers when necessary to carry out the provisions of title 11).

frame between the filing of this Motion, the commencement of the bidding process and the Auction should provide interested purchasers ample time to participate in the sale process.

**F.      The Stalking Horse Protections Are Appropriate Under the Circumstances**

71.     As noted above, the Stalking Horse Purchaser has proceeded in reliance upon the agreement by the Debtors to seek the Stalking Horse Protections and in reasonable expectation that this Court would enter an order providing such relief.  The Debtors submit that the Stalking Horse Protections are a normal and oftentimes necessary component of sales outside the ordinary course of business under section 363 of the Bankruptcy Code.  In particular, such protections encourage a potential purchaser to invest the requisite time, money and effort to conduct due diligence and negotiations with a debtor despite the inherent risks and uncertainties of the chapter 11 process.  See, e.g., In re Hupp Indus., 140 B.R. 191, 194 (Bankr. N.D. Ohio 1997) (without any reimbursement, "bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's. . . due diligence"); In re Marrose Corp., 1992 WL 33848, at *5 (Bankr. S.D.N.Y. 1992) (stating that "agreements to provide reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers").  Here, the Stalking Horse Purchaser is also the DIP Lender and, in both cases, has enhanced the value of the Debtors' estates by setting the floor for a competitive auction process.

72.     Moreover, bid protections, similar to the Stalking Horse Protections sought to be approved by this Motion, have been approved in other chapter 11 cases in this Court.  See, e.g., In re Zloop, Inc., Case No. 15-11660 (KJC) (Bankr. D. Del. May 16, 2016) (approving break-up fee of 3% and expense reimbursement of $75,000 in connection with $1.4 million sale of assets); In re Cal Dive Int'l, Inc., No. 15-10458 (CSS) (Bankr. D. Del. July 7, 2015)

- 37 -

(authorizing expense reimbursements of $100,000 in connection with $12 million sale of assets and $82,000 in connection with $4.1 million sale of assets); In re Old FOH Inc. (f/k/a/ Frederick's of Hollywood, Inc.), No. 15-10836 (KG) (May 6, 2015) (authorizing a termination fee of $775,00 and expense reimbursement $300,000 in connection with $22.5 million sale of assets); In re Caché Inc., No. 15-10172 (MFW) (Bankr. D. Del. Feb. 25, 2015) (authorizing expense reimbursement of $100,000 and break-up fee of $225,000); In re Coldwater Creek, Inc., No. 14-10867 (BLS) (Bankr. D. Del. Apr. 29, 2014) (approving signage expense reimbursement of $800,000 and break-up fee of 1.5% in connection with approximately $90 million sale of assets); In re Vertis Holdings, Inc., Case No. 12-12821 (CSS) (Bankr. D. Del. Nov. 2, 2012) (approving break-up fee of 3.0% in connection with a $258 million sale of assets); In re Solyndra LLC, Case No. 11-12799 (MFW) (Bankr. D. Del. Sept. 28, 2012) (approving break-up fee of 2.6% in connection with $90 million sale of assets); In re Conex Holdings, LLC, Case No. 11-10501 (CSS) (Bankr. D. Del. Sept. 14, 2011) (approving break-up fee of 3% of final purchase price).

73.    A proposed bidding incentive, such as the Break-Up Fee and Expense Reimbursement, should be approved when it is in the best interests of the estate. In re Hupp Indus., Inc., 140 B.R. 191 (Bankr. N.D. Ohio 1992). Typically, this requires that the bidding incentive provide some benefit to the debtor's estate. Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 533 (3d Cir. 1999) (holding even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions the administrative expense provisions of Bankruptcy Code section 503(b) govern in the bankruptcy context).

74.     In Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy), the Third Circuit found that whether break-up fees and expenses could be paid to Calpine Corp. ("Calpine") as a "stalking horse" depended on whether such fees were necessary to preserve the value of the estate.  O'Brien Envtl. Energy, 181 F.3d at 536.  There, the court determined that Calpine's right to break-up fees and expenses depended on whether it provided a benefit to the debtor's estate by promoting competitive bidding or researching the value of the assets at issue to increase the likelihood that the selling price reflected the true value of the company.  Id. at 537.  In the instant matter, the Debtors believe that approval of the Stalking Horse Protections will create such a competitive bidding process.

75.     First, the Break-Up Fee induced the Stalking Horse Purchaser to submit a bid that will serve as a minimum floor bid upon which other bidders may rely.  Therefore, the Stalking Horse Purchaser has provided a material benefit to the Debtors, their estates and their creditors by encouraging bidding and increasing the likelihood that the best possible price for the Purchased Assets will be received.  See Integrated Resources, 147 B.R. at 659 (noting that termination payment is an "important tool to encourage bidding and to maximize the value of the debtor's assets").

76.     Second, the Debtors believe that the Stalking Horse Protections are fair and reasonably compensate the Stalking Horse Purchaser for taking actions that will benefit the Debtors' estates.  The Expense Reimbursement compensates the Stalking Horse Purchaser for diligence and professional fees incurred in negotiating the terms of the Stalking Horse Agreement on an expedited timeline.

77.     Third, the proposed Stalking Horse Protections are the result of an arm's-length negotiated agreement between the Debtors, in consultation with Encina, and the Stalking Horse

Purchaser.  There is no evidence or reason to believe that the relationship between the Debtors and the Stalking Horse Purchaser has been tainted by self-dealing or manipulation.

78.    *Fourth*, the Debtors do not believe that the Stalking Horse Protections will have a chilling effect on the sale process.  Rather, the Stalking Horse Purchaser has increased the likelihood that the best possible price for the Purchased Assets will be received, by permitting other Qualified Bidders to rely on the diligence performed by the Stalking Horse Purchaser, and moreover, by allowing Qualified Bidders to utilize the Stalking Horse Agreement as a platform for negotiations in the context of a competitive bidding process.

79.    *Finally*, the Stalking Horse Protections will be paid only if, among other things, the Debtors enter into a transaction with a Successful Bidder other than the Stalking Horse Purchaser, whose bid will compensate the Debtors for the payment of the Stalking Horse Protections.  Accordingly, no Stalking Horse Protections will be paid unless a higher or better offer is achieved and consummated.

80.    The Debtors believe that the proposed Stalking Horse Protections are fair and reasonably compensate the Stalking Horse Purchaser for taking actions that will benefit the Debtors' estates.  The Break-Up Fee in the amount of $1,750,000 of the Stalking Horse Purchase Price is within the range of break-up fees that have been approved by this Court in other cases.

81.    In sum, the Stalking Horse Protections are reasonable under the circumstances and will enable the Debtors to maximize the value received for the Purchased Assets while limiting any chilling effect on the sale process.  The Stalking Horse Protections not only compensate the Debtors for the risk that they assume in foregoing a known, willing and able purchaser for a new potential acquirer, but also ensure that there is an increase in the net

proceeds received by their estates, after deducting the Stalking Horse Protections to be paid to the Stalking Horse Purchaser in the event of a prevailing overbid.

## G.      Assumption and Assignment of Contracts and Leases

82.      Section 365(a) of the Bankruptcy Code provides that, subject to the court's approval, a trustee "may assume or reject any executory contracts or unexpired leases of the debtor." 11 U.S.C. § 365(a). Upon finding that a trustee has exercised its sound business judgment in determining to assume an executory contract or unexpired lease, courts will approve the assumption under section 365(a) of the Bankruptcy Code. See Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.), 78 F.3d 18, 25 (2d Cir. 1996); Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1099 (2d Cir. 1993).

83.      Pursuant to section 365(f)(2) of the Bankruptcy Code, a trustee may assign an executory contract or unexpired lease of nonresidential real property if:

　　a.  the trustee assumes such contract or lease in accordance with the provisions of this section; and

　　b.  adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

84.      The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1989) (internal citations omitted); see also In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); In re Bon Ton Rest. & Pastry Shop, Inc., 53 B.R. 789, 803

- 41 -

(Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

85.    Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  In re Bygaph, Inc., 56 B.R. at 605-06 (adequate assurance of future performance is present when prospective assignee of lease has financial resources and expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding; chief determinant of adequate assurance is whether rent will be paid).

86.    The Debtors and the Successful Bidder will present evidence at the Sale Hearing to demonstrate the financial credibility, willingness and ability of the Successful Bidder to perform under the Assumed Executory Contracts.  The Court and other interested parties, therefore, will have the opportunity to evaluate the ability of any Successful Bidder to provide adequate assurance of future performance under the Assumed Executory Contracts, as required by section 365(b)(1)(C) of the Bankruptcy Code.

87.    In addition, the Cure Procedures are appropriate and consistent with section 365 of the Bankruptcy Code.  To the extent that any defaults exist under any Assumed Executory Contracts, any such defaults will be cured.  Any provision in any Assumed Executory Contract that would restrict, condition, or prohibit an assignment of such Assumed Executory Contract is deemed unenforceable pursuant to section 365(f)(1) of the Bankruptcy Code by operation of law.

88.    Accordingly, the Debtors submit that the Cure Procedures for effectuating the assumption and assignment of the Assumed Executory Contracts as set forth herein are appropriate and should be approved.

**H.      Relief from the Fourteen Day Waiting Period Under**
**         Bankruptcy Rules 6004(h) and 6006(d) is Appropriate.**

89.      Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."    Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."   The Debtors request that the Bidding Procedures Order and the Sale Order, as applicable, be effective immediately by providing that the fourteen (14) day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

90.      The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.   See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).   Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen (14) day stay period, Collier suggests that the fourteen (14) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." Collier on Bankruptcy P 6004.11 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).   Furthermore, Collier provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. Id.

91.      The Debtors hereby request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d) or, in the alternative, if an objection to the Sale is

- 43 -

filed, reduce the stay period to the minimum amount of time needed by the objecting party to file its appeal.

### **Notice**

92.     Notice of this Motion shall be provided to: (a) the Office of the United States Trustee for the District of Delaware, (b) each of the Debtors' twenty (20) largest unsecured creditors on a consolidated basis, (c) counsel to the Agent for the Prepetition First Lien Lenders, (d) counsel to the Agent for the Prepetition Second Lien Lender, (e) counsel to the DIP Lender, (f) counsel to the Stalking Horse Purchaser, (g) the United States Attorney's Office for the District of Delaware, (h) the Internal Revenue Service, (i) the Securities and Exchange Commission, and (j) any  party that has requested notice pursuant to Bankruptcy Rule 2002..

*[Remainder of page intentionally left blank]*

**WHEREFORE**, the Debtors respectfully request that the Court enter orders substantially in the form attached hereto as **Exhibit C** and **Exhibit F**: (a) granting the relief requested herein and (b) granting to the Debtors such other and further relief as the Court may deem proper.

Dated:  May 14, 2017
       Wilmington, Delaware

Respectfully submitted,

**DLA PIPER LLP (US)**

*/s/ Stuart M. Brown*
Stuart M. Brown (DE 4050)
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801
Telephone:  (302) 468-5700
Facsimile:  (302) 394-2341
Email:  stuart.brown@dlapiper.com

-and-

John K. Lyons (*pro hac vice* admission pending)
Daniel M. Simon (*pro hac vice* admission pending)
Oksana Koltko Rosaluk (*pro hac vice* admission pending)
444 West Lake Street, Suite 900
Chicago, Illinois 60606
Telephone:  (312) 368-4000
Facsimile:  (312) 236-7516
Email: john.lyons@dlapiper.com
      daniel.simon@dlapiper.com
      oksana.koltkorosaluk@dlapiper.com

*Proposed Counsel to the Debtors*